**FINANCIAL SECURITY SERVICES, INC., Appellant,**

v.

**PHASE I ELECTRONICS OF WEST TEXAS, INC., Appellee.**

No. 07–98–0182–CV.

Court of Appeals of Texas, Amarillo.

July 12, 1999.

Rehearing Overruled Sept. 20, 1999.

Thompson & Knight, Scott Patrick Stolley, Steven R. Baggett, Dallas, Law Office of Richard N. Countiss, Richard N. Countiss, Houston, for appellant.

Law Office of Linda J. Smith, Linda J. Smith, Lubbock, for appellee.

Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

JOHN T. BOYD, Chief Justice.

In challenging a judgment in favor of appellee Phase I Electronics of West Texas, Inc. (Phase I), appellant Financial Security Services, Inc. (FSS) presents seven issues which, it contends, show errors requiring reversal committed by the trial court. For reasons we later state, we reverse the judgment of the trial court and render judgment that Phase I take nothing on its usury claim against FSS and that FSS take nothing on its claim seeking an award of attorney fees.

FSS specializes in providing financial and other services to the security and alarm industry. Jim Alexander and his son Karlen founded Phase I in 1993 to provide alarm services. In March 1994, Phase I and FSS executed a set of agreements. Included in those agreements were a loan and security agreement, a promissory note, a contingent payment agreement, and a billing and collection services agreement. The general nature of the relationship of the parties was that Phase I would enter into contracts with its customers to provide alarm monitoring services. The contracts were presented to FSS and, while they were not actually assigned to FSS, on contracts upon which FSS made cash advances, Phase I would assign a security interest in favor of FSS as collateral to secure those cash advances. For a separate fee, FSS provided billing and collection services to Phase I. In instances in which FSS was providing those services, Phase I agreed not to bill or collect itself. FSS would take the payments made from Phase I's customers, deposit them in a collateral account, and apply them first to the cost of monitoring the alarms by a third party; second, to

FSS's own billing and collection fees; third, to interest on the promissory note from Phase I; and finally, on principal owed on that note.

The nominal interest on the Phase I notes was 13 percent. The cash advances to Phase I were subject to a five percent "program fee." For the purpose of determining the maximum allowable rate of interest, the parties agree that the program fee was interest. FSS and Phase I also executed a "contingent payment agreement" we will describe in greater detail below.

Phase I originally assigned 275 contracts to FSS on which FSS advanced $78,751. FSS later determined that approximately 40 of those contracts did not have original signatures. Phase I admitted that it could not locate original contracts for those customers so it "recreated" the contracts using customers' signatures from other documents. During the first three months of the contracts between FSS and Phase I, the payments received from Phase I's customers were not enough to pay the monitoring charges. By letter dated May 18, 1994, FSS offered to "eliminate the Contingent Payment amount due of $26,-250.42" if Phase I paid its entire loan balance within 30 days.

Phase I did not pay the note and, by certified mail, FSS sent a second letter in which it stated that a deficiency of $4,211.59 existed in Phase I's collateral account and requested payment. It noted the contracts that did not contain proper signatures and requested "true correct and complete" contracts. It also alleged that Phase I had told it that customer contracts had been canceled when in fact Phase I continued to bill and collect those customers directly. In the letter, it requested that those contracts be restored to FSS's billing system and set a deadline of August 31, 1994, within which Phase I must satisfy its request or be considered in default.

Because Phase I did not comply with this request, on September 2, 1994, FSS sent another letter stating that Phase I's note was in default and if the total due FSS of $88,499.95 was not paid by September 22, 1994, FSS would accelerate the note and foreclose upon its security interest. On October 3, 1994, Phase I filed the suit giving rise to this appeal in which it alleged violation of the Texas Deceptive Trade Practices Act (the DTPA), a breach of the duty of good faith and fair dealing, breach of contract, negligence, usury, and seeking a declaratory judgment that the contracts were void. In January 1995, it paid the balance due on the note to FSS. Although Phase I has never paid the contingent payment amount, FSS has not sought payment of that amount.

■ On July 14, 1997, the trial court granted a partial summary judgment in favor of FSS denying Phase I's DTPA claims. However, it denied the portion of FSS's motion seeking summary judgment on the breach of contract and usury claims. In its judgment, the trial court recited that Phase I had agreed to dismissal of its claims of the breach of the duty of good faith and fair dealing and negligence.[1] After a bench trial, the trial court rendered judgment that FSS contracted, charged, and/or received a usurious rate of interest in excess of double the allowable amount and awarded Phase I a recovery of $312,-024.24 together with post-judgment interest from March 2, 1998, at the rate of 10 percent per annum. The court's judgment did not make an express disposition of Phase I's breach of contract claim and contained no "Mother Hubbard" clause. However, it is the rule that when a judgment such as this one, not intrinsically interlocutory in character and rendered and entered in a case regularly set for a conventional trial on the merits, no order for a separate trial of issues having been

---

1. Parenthetically, in its sixth amended petition, filed four months after the partial summary judgment, Phase I continued to assert its DTPA and negligence claims. It did, however, drop its claim seeking declaratory judgment.

rendered, has been entered, we may presume that the trial court intended to, and did, dispose of all the claims remaining before it. *North East Independent School District v. Aldridge,* 400 S.W.2d 893, 897–98 (Tex.1966).

The specific issues raised by FSS are 1) whether the base collateral is interest, 2) whether the contingent payment amount is interest, 3) the effect of FSS's nonreceipt of the contingent payment amount, 4) whether the trial court erred in finding that FSS contracted for a usurious rate of interest, 5) whether the usury saving clause cured any potential usury violation in the contracts, 6) whether the trial court erred in failing to apply the usury saving clause to the contingent payment in determining the legal limit, and 7) whether FSS is entitled to recover attorney fees.

The parties agree that former Article 5069–1.01—.12 of the Revised Civil Statutes (Vernon 1987) (repealed 1997) governs this case. Article 5069–1.01(a) defines interest as "the compensation allowed by law for the use or forbearance or detention of money." The parties also agree that the maximum legal rate of interest applicable to this transaction was 18 percent. Article 5069–1.06 provides penalties for interest charges in excess of the legal maximum, including the forfeiture of three times the interest charged. If the interest charged is more than twice the amount allowed, the lender must also forfeit the principal and other fees. *Id.*

█ Our supreme court has held that a usurious transaction is composed of three elements. They are 1) a loan of money; 2) an absolute obligation to repay the principal; and 3) the exaction of a greater compensation than allowed by law for the use of money by the borrower. *First Bank v. Tony's Tortilla Factory, Inc.,* 877 S.W.2d 285, 287 (Tex.1994). If an amount of money is not interest, then it cannot form the basis of a usury claim. *Id.* When construing a contract under a usury claim, courts presume the parties intended a nonusurious contract. *Smart v.*

*Tower Land and Inv. Co.,* 597 S.W.2d 333, 341 (Tex.1980).

█ As we have noted, the nominal rate of interest on the promissory note executed by Phase I was 13 percent per annum. FSS argues that the program fee should be distributed across the five year term of the agreement, adding one percent to the note's interest. We disagree. The program fee was an advance payment of interest. Because the contract was silent on the disposition of this advance payment in the event of acceleration, applying the inference of legality noted in *Smart,* the contract itself could be construed as nonusurious. *Id.* However, usury exists when the lender "contracts for, charges or receives" interest greater than that allowed by law. *See* Tex.Rev.Civ. Stat. Ann. art. 5069–1.06(1) (repealed). Because FSS did not credit or refund the advance payment when it accepted payment on the accelerated note after one year, it received the additional five percent interest as compensation for the one year loan to Phase I, making the rate paid by Phase I 18 percent. Because the stated interest together with the program fee raised the interest charged to the maximum permitted by statute, any additional interest would support a usury finding, unless the savings clause was effective.

### Base Collateral as Interest

█ Discussion of FSS's first issue requires a more detailed consideration of the agreements at issue and the role of the base collateral. The loan and security agreement recited that the parties contemplated a one-year interest-only line of credit with cash advances to be converted to a loan with a four-year payment period, and an additional one-year loan to allow Phase I to "buyout" FSS's contingent payment. Article I of the agreement contained several definitions, including the agreement's central concept of "monthly recurring revenue" (MRR) which was produced by Phase I's customers. The agree-

ment defined "borrowing availability" as 18 times the amount of the MRR produced by eligible alarm contracts. It also defined "base collateral" as the greater of $2,000 or $1,000 for each $50,000 advanced under the agreement and stated that "base collateral shall not produce borrowing availability." It is undisputed that the $2,000 required minimum applied here. The agreement also defined a "collateral account" as an account under the control of FSS and defined "contingent payment" as six times the aggregate MRR.

In Article II, the aggregate principal amount of the loan was set at $105,000 and provided that cash advances "shall be in an amount up to the aggregate amount of Borrowing Availability[.]" In the same paragraph, it was stated that "Cash Advances will not be available to Borrower [ ] if the Base Collateral is not in place at the time of any Cash Advance Request." It also provided that Phase I might "elect to finance the buyout of Lender's Contingent Payment" after the original loan was paid and there was no event of default under the agreement.

FSS describes these provisions of the contract as creating a formula to determine the amount Phase I was eligible to borrow. It reasons that the contract requires FSS to subtract the base collateral from the MRR and multiply the result by 18 to determine the borrowing availability. Consequently, it argues, the base collateral is merely a variable in this formula chosen to ensure that the amount it loaned was less than the full value of the collateral. It was not a sum of cash which was held on deposit or a charge for the use of money.

As relevant to this issue, the trial court found 1) cash advances were based on 18 times MRR; 2) FSS "withheld from funding as Base Collateral $2,000.00 of MRR. Since the available funding was calculated on 18 times the MRR, $36,000.00 was withheld from funding"; 3) "The provision of

$2,000.00 monthly recurring revenue (MRR) withheld from funding, identified as Base Collateral, was determined to be a frozen account for which $36,000.00 was not funded; and since no additional consideration was given for this frozen account, other than use, forbearance or detention of money, the frozen account was therefore deemed to be contracted for and a charge of usurious interest was made in excess of 18% per annum."

In support of the trial court's findings, Phase I argues that its borrowing availability under the loan agreement was 18 times the MRR and the conduct of FSS in not applying the factor of 18 to the full MRR rendered the base collateral a "frozen account" on which FSS failed to pay interest to Phase I. In support of this proposition, Phase I cites a document created by FSS entitled "Financial Analysis for Phase One Electronics." That instrument contains a footnote explaining how it reached the initial cash advance amount which says, "[a]mount of up-front cash from loan [sic] is determined by advancing at *18* times against *463* accounts each producing monthly recurring revenue of *$22.00* to produce the up-front loan of *$183,348*." It made no mention of the base collateral.

We do not agree that the base collateral under the loan was a frozen account, that FSS as a lender was obligated to either pay interest to Phase I on its collateral, to pay interest to Phase I on funds not advanced to Phase I, or that such interest should be considered part of the interest paid by Phase I to FSS.

The evidence establishes that FSS did not retain any funds in the "collateral account."[2] Its collateral was the security interest Phase I granted in the contracts between Phase I and its alarm customers. No part of the payments made by the alarm customers were segregated or held

**2.** FSS's description of this account as a "collateral account" could cause confusion. It is clear from the use made of this account under

the contract that it may more properly be considered as an escrow account.

back as collateral by FSS. All of those payments were applied to the expense of monitoring, billing, and paying interest and principal on the loan.

Phase I argues that the decision in *First State Bank of Bedford v. Miller*, 563 S.W.2d 572 (Tex.1978), supports its position that FSS was required to pay interest on amounts not advanced to Phase I. We disagree. In *Miller*, the parties entered into a loan agreement and promissory note for $70,000. However, the lender only advanced $56,000 to the borrower, leaving $14,000 in a non-interest bearing account. Nevertheless, the lender charged interest on the full $70,000. When the court applied the interest actually charged against the amount actually advanced ($56,000), the result was a usurious rate of interest. In contrast, here FSS only charged the contracted 13 percent interest on the amount actually advanced. The reasoning employed in *Miller*, at most, is only applicable to the five percent program fee which, as we noted above, increased the true rate to the legal maximum of 18 percent.

■ Even assuming, as Phase I contends, that FSS was contractually obligated to advance additional sums and failed to do so, that failure would only entitle Phase I to damages for breach of contract and would not give it a direct right or title to the withheld funds. Restated, a lender has no obligation to pay, or give credit for, interest on funds not loaned as those unadvanced funds do not belong to the borrower.

Additionally, Phase I has failed to present any authority limiting a lender's right to require collateral greater than the amount of its loan, nor have we found any such authority. We believe there is no such limitation. We see no legal significance in FSS's decision to loan 18 times the MRR reduced by the base collateral instead of having some lower multiple of the MRR without a base collateral. By deducting the base collateral from the MRR, FSS has chosen to advance less per

alarm customer to borrowers with fewer customers. Although this business decision imposes some burdens on borrowers with a smaller customer base, increased interest is not one of those burdens.

Thus, we hold that the base collateral provision in the parties' loan agreement was not interest. The trial court erred in finding that the base collateral was a frozen account and that it increased the amount of interest charged to Phase I. We sustain FSS's first issue.

In its second and third issues, FSS asks us to determine if the contingent payment was properly considered interest although it was not received. In its fourth issue, it asks if the trial court erred in holding that FSS contracted for a usurious rate of interest. As we have noted, usury can be based upon contracting for, charging, or receiving interest in excess of the statutory maximum. Tex.Rev.Civ. Stat. Ann. art. 5069–1.06 (repealed). Where the agreement terminates prematurely, as here, those rates would be different. We noted that because the five percent program fee was actually paid over one year, it added five percent to the note's stated 13 percent interest rate, and FSS *received* 18 percent interest from those two items. However, in their contract, the parties anticipated the program fee being paid over a five-year period which would reduce the contractual interest rate to 14 percent. It is undisputed that Phase I has not made any payment under the contingent payment agreement. Thus, if the contingent payment is interest for the purposes of determining usury, that determination must be based on the terms of the parties' original contract or what FSS charged Phase I, not upon what was received by FSS. Answering no to FSS's third issue asking whether its "nonreceipt of the contingent payment trigger[ed] the usury statute," we overrule that issue.

■ We initially address Phase I's argument that the May 18, 1994 letter from FSS was a charge of the contingent pay-

ment. The text of this letter is set out in the margin.[3] Phase I cites no authority for its position that the letter was a charge but relies on the testimony of FSS president Craig Hock that it was his opinion that the contingent payment amount was owed at the time of the letter. Although FSS does not specifically argue that the letter was not a charge but seeks to rely on the usury savings clause, under the applicable authority, we hold that the letter was not a charge.

Texas opinions addressing the issue of what constitutes a charge under the usury statute have a common thread, an express or implied demand for payment. *See, e.g., Windhorst v. Adcock Pipe and Supply*, 547 S.W.2d 260 (Tex.1977); *Woodcrest Associates v. Commonwealth Mortgage*, 775 S.W.2d 434, 437 (Tex.App.—Dallas 1989, writ denied)(letter declaring note accelerated and demanding payment); *Coppedge v. Colonial Sav. & Loan Ass'n*, 721 S.W.2d 933, 936 (Tex.App.—Dallas 1986, writ ref'd n.r.e.) (letter from attorney demanding payment); *Mecey v. Seggern*, 596 S.W.2d 924, 927 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.) (sending statements declaring amounts due); *Moore v. Sabine Nat. Bank of Port Arthur*, 527 S.W.2d 209, 212 (Tex. Civ.App.—Austin 1975, writ ref'd n.r.e.) (notice of intent to repossess and demand for payment).

Viewed against the rule stated in these cases, the May 18, 1994 letter from FSS cannot be construed as a demand for payment of the contingent payment amount. The letter was an offer to modify the parties' prior agreement. In consideration of early repayment of the principal and accrued interest, which the letter did not claim was due under the original agreement, FSS agreed to forego its claim to the contingent payment. This offer to modify the original agreement did not constitute a charge.

The contingent payment agreement was executed separately and began with the recitation that it was made "[i]n consideration of the assistance provided by [FSS] to [Phase I]." It also contained a "stipulation" that the agreement did not create a contract to pay for the use, forbearance, or detention of money or interest at a rate greater than allowed by law. The provisions governing how the amount of the payment was to be determined are not wholly without ambiguity. Under paragraph 3, the contingent payment interest attached to the MRR being billed by FSS. Paragraph 2 provides that after the conversion date, which was to occur after one year, the interest attached to alarm contracts which were not canceled within 90 days and "produce MRR equal to not less than the aggregate Cash Advances divided by the Borrowing Availability."[4] Paragraph 5 provides the amount of the contingent payment is six times the amount of MRR to which the interest attached.

■ We initially disagree with the contention that the contingent payment agreement was for services rendered by FSS. FSS separately charged, and was paid, for its billing and collection services. The financing statement prepared by FSS reflected the true nature of the contingent payment as a cost of financing. FSS's main challenge to the trial court's holding

---

**3.** The body of the letter from FSS president, David S. Fields provided:

> In connection with my conversation this afternoon with Jim, Financial Security Services Inc. ("FSS") agrees to eliminate the Contingent Payment amount due of $26,250.42 under the condition described below.
>
> The payment of the entire loan balance, including the Per Diem interest charge from May 18, 1994, must be received by FSS within thirty (30) calendar days from

this date. If such payment is not received within this time period, the Contingent Payment amount will be reinstated.

**4.** There appears to be no dispute that the parties intended that the interest attach to contracts producing MRR not less than aggregate cash advances divided by the borrowing availability *factor* of 18. Dividing cash advances by "borrowing availability" as defined in the loan agreement results in a value near 1.

is that because the contingent payment interest attaches to specific contracts on the conversion date, the amount could be reduced, even to zero, if those contracts were not in effect when the contingent payment became due. Parenthetically, it does not explain why paragraph 3 would not continue to be effective after the conversion date. FSS argues that the contingent nature of the payment as to both date and amount precludes its consideration as interest. It cites *Beavers v. Taylor*, 434 S.W.2d 230, 231 (Tex.Civ.App.—Waco 1968, writ ref'd n.r.e.), and cases following it for the proposition that payments which are contingent, uncertain, or speculative are not interest for the purpose of determining usury.

The holding in *Beavers* that "a contract is not usurious where the lender is to receive uncertain value, as here, even though the probable value is greater than lawful interest," offers support of FSS's argument. *Id.* at 231. *Beavers* has been cited with approval on several occasions. *See, e.g., Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994).

Phase I contends that in *Southwestern Investment Co. v. Hockley County Seed & Delinting, Inc.*, 511 S.W.2d 724 (Tex.Civ. App.—Amarillo 1974), *writ ref'd n.r.e.*, 516 S.W.2d 136 (1974), this court held that if there is any contingency by which an excessive rate of interest may be charged in any year, the contract is usurious. However, we do not agree that *Southwestern* affords the support Phase I seeks. First, the case did not involve any payments which were contingent in either existence or amount such as the ones before us here. The issue in *Southwestern Investment* was the effect of an increase in the maximum legal rate of interest upon a contract which, at the time it was executed, provided for an interest rate in excess of that allowable at the time the contract was made. Because the contract provided for a usurious rate at the time it was made, it was usurious even though the contractual rate was within the legal rate at the end of the loan period. To the degree that our opinion in *Southwestern Investment* could be construed to hold the judicially determined rate of interest should not be spread over the full period of the loan, it was expressly disapproved by our supreme court in *Tanner Development Co. v. Ferguson*, 561 S.W.2d 777, 787 (Tex.1977).

As authority supporting its position that the existence of any contingency by which it could be obligated to pay interest in excess of 18 percent under the contract, Phase I also cites *Smart v. Tower Land & Inv. Co.*, 597 S.W.2d 333 (Tex.1980); *Shropshire v. Commerce Farm Credit Co.*, 120 Tex. 400, 30 S.W.2d 282 (1930), *cert. denied*, 284 U.S. 675, 52 S.Ct. 130, 76 L.Ed. 571 (1931); *Dixon v. Brooks*, 604 S.W.2d 330 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); and *Najarro v. SASI International, Ltd.*, 904 F.2d 1002 (5th Cir.1990). *See also Fisher v. Westinghouse Credit Corp.*, 760 S.W.2d 802, 805 (Tex.App.—Dallas 1988, no writ). Phase I cites and relies upon *Najarro* as authority for the proposition the *Beavers* holding is no longer a correct statement of the law. In *Najarro*, the Fifth Circuit noted the apparent conflict between the *Beavers* holding that uncertainty as to a payment prevented it from being treated as interest, and such cases as *Smart, Shropshire*, and *Dixon*, holding that any contingency that might permit the recovery of excess interest is sufficient to render a contract usurious. As a basis for rejecting the *Beavers* holding, the *Najarro* court opined that reasoning had not been followed in the more recent cases of *Smart* and *Dixon* and it was not supported by *Smart* and *Shropshire*, which it characterized as the only Texas Supreme Court cases on the issue.

However, several cases decided both before and after *Najarro* undermine the basis of its holding. First, *Najarro* did not address the Texas Supreme Court's decision in *W.E. Grace Manufacturing Co. v. Levin*, 506 S.W.2d 580 (Tex.1974), in which the court held that a contingency does not

render a contract usurious merely because there is a possibility that more than the legal rate of interest might be paid. *Id.* at 584. Even more significantly, our supreme court recently released their opinion in *First USA Management, Inc. v. Esmond,* 960 S.W.2d 625 (Tex.1997). In that case, and relying upon *Beavers,* the court refused to hold an amount was interest when the amount was speculative. *Id.* at 628. Specifically, the court noted "uncertainty in the value of a contractual right that a debtor claims is interest casts doubt on whether that value can be characterized as interest." *Id.*

Here, Phase I claims that the contingency value is one third of the total amount of the loan because the contingent payment multiple of six times MRR is one third the lending multiple of 18 times MRR. Unlike the borrowing availability, which is based upon virtually the entire MRR, the contingent payment was computed on MRR generated by contract in effect on the conversion date, and it only became due on the date of the payment of the original note or default. Therefore, the amount of the payment could not be determined until it was due. In accordance with the *Esmond* holding, in determining whether the amount can be characterized as interest, we must consider the certainty of the amount. *Id.* Phase I cites no evidence as to the number of contracts likely to be in force at the maturity of the note and therefore, the probable value of the contingency payment. Without such evidence, the amount is speculative and cannot properly be characterized as interest. We hold that Phase I failed to establish that FSS contracted for a usurious rate of interest. We must, therefore, sustain FSS's second and fourth issues.

Our disposition of the second and fourth issues makes it unnecessary to discuss FSS's fifth and sixth issues. In its seventh issue, FSS asks us to determine whether it was entitled to recover its attorney fees from Phase I under the terms of the loan documents. FSS relies upon a sweeping indemnification clause in the Loan and Security Agreement which reads:

> Borrower agrees to indemnify Lender, upon demand, and to hold Lender and its directors, officers, employees, shareholders and agents (collectively, the "Indemnitees") harmless from and against any and all loss, liability, damage, deficiency, claim or expense of any kind or nature whatsoever including, without limitation, legal expenses and costs, which the Indemnitees may suffer, sustain, become subject to, or have asserted against them whether or not caused by any such Indemnitee's negligence, as a result of or in connection with (i) the Program Documents and the transaction and events at any time associated therewith (including the enforcement of the Program Documents and the defense of Lender's actions and inactions in connection with the Loan or any subsequent loan), (ii) the breach by borrower of any representation, warranty, covenant or agreement if it is contained in this agreement, (iii) the execution, delivery or performance by borrower of any Alarm Contract (including, without limitation, use of any designated central station), (iv) any act or omission by Borrower or Lender with respect to any Alarm Contract, including, without limitation, use of any designated central station), (iv) any act or omission by Borrower or Lender with respect to any Alarm Contract, including, without limitation, the failure by Borrower to properly service or administer any Alarm Contract, and any claim by any Subscriber (or person related thereto) of any nature under any Alarm Contract, or (v) any efforts of Lender to seek to enforce the indemnification obligation of Borrower to Lender pursuant to this Agreement. Borrower hereby waives any rights of subrogation it may now or later have against Lender.

As evidence of its entitlement to attorney fees under the indemnification clause,

FSS cites the testimony of its attorney, Steve Baggett, concerning the amount of time he spent representing FSS and his hourly billing rate. Baggett also testified that FSS would not be entitled to indemnification if Phase I prevailed on its usury claim. The trial court did not state the basis upon which it was denying the attorney fees. The reversal of the trial court's judgment which will be required as a result of our disposition of the issues presented in this appeal requires us to reconsider whether FSS is entitled to indemnification.

 A prerequisite of its entitlement to indemnification was that FSS must make demand upon Phase I for such indemnification. Although FSS argues that the agreement did not require such a demand, that is contrary to the plain language of the agreement. The only evidence that FSS made such an indemnification demand upon Phase I is the counterclaim filed by FSS. Even if we treat this counterclaim as a demand, its failure to state the amount and extent of the indemnification it sought failed to satisfy the clear intent of the contract. Because FSS failed to satisfy the condition precedent to indemnification, it has not shown its entitlement to that relief. We overrule FSS's seventh issue.

In conformity with our disposition of FSS's first, second, fourth, and seventh issues, we reverse the judgment of the trial court and render judgment that Phase I take nothing by its suit, and that FSS take nothing upon its counterclaim seeking attorney fees.