**LONG DISTANCE INTERNATIONAL, INC. and Star Marketing Service, Inc., Appellants,**

v.

**TELEFONOS DE MEXICO, S.A., SBC International, Inc., and SBC Communications, Inc., Appellees.**

No. 04–98–00873–CV.

Court of Appeals of Texas, San Antonio.

Jan. 31, 2000.

Randall A. Pulman, John M. Castillo, Stumpf, Falgout, Craddock & Massey, P.C., San Antonio, for appellant.

Javier Aguilar, James S. Golden, SBC Communications, Inc., Hubert W. Green, Daniel W. Lanfear, The Kleberg Law Firm, P.C., George H. Spencer, Jr., Jorge E. Canseco, Jeffrey I. Kavy, Clemens & Spencer, P.C., San Antonio, for appellee.

Sitting: PHIL HARDBERGER, Chief Justice, TOM RICKHOFF, Justice ALMA L. LÓPEZ, Justice.

### OPINION ON APPELLANTS' MOTION FOR REHEARING

PHIL HARDBERGER, Chief Justice.

The motion for rehearing filed by appellants, Long Distance International, Inc. and Star Marketing Service, Inc., is denied. This court's opinion and judgment dated November 24, 1999 are withdrawn, and this opinion and judgment are substituted.

■ We substitute this opinion to cite the laws and regulations of Mexico we relied on in reaching our decision. We also acknowledge that since our opinion issued the Fifth Circuit issued *Access Telecom, Inc. v. MCI Telecommunications Corp., et al.*, 197 F.3d 694 (5th Cir.1999). We have read the Fifth Circuit's opinion with great interest and respect; however, we also are aware that petitions for rehearing en banc are pending, that the Fifth Circuit has requested Access Telecom, Inc. to file a response to the petitions for rehearing en banc, and that the SCT has filed an amicus curiae brief in support of the petitions for rehearing en banc. In addition, while this court may certainly draw upon Fifth Circuit precedent in reaching a decision, we are obligated to follow only higher Texas courts and the United States Supreme Court. *See Penrod Drilling Corp. v. Williams,* 868 S.W.2d 294, 296 (Tex.1993); *see also Lee M. Bass, Inc. v. Shell Western E & P, Inc.,* 957 S.W.2d 159, 162 n. 4 (Tex.App.—San Antonio 1997, no pet.).

Long Distance International, Inc. ("LDI") and Star Marketing Service, Inc. ("Star") appeal an order granting summary judgment in favor of Telefonos de Mexico, S.A. ("Telmex"), SBC International, Inc. ("SBI") and SBC Communications, Inc. ("SBC"). LDI and Star generally challenge the order granting the summary judgments and specifically assert: (1) LDI/Star's conduct was legal and comity considerations are not applicable; (2) the conduct engaged in by Telmex, SBI, and SBC was wrongful and without privilege; (3) LDI/Star's antitrust claims are valid and the Texas Antitrust Act is applicable; (4) Telmex, SBI and SBC conspired against LDI/Star; (5) the Texas Deceptive Trade Practices Act is applicable; (6) LDI/Star's breach of contract claim is valid; and (7) LDI/Star have suffered damages. Telmex filed a cross-appeal challenging the trial court's order denying its special appearance. We overrule Telmex's contention regarding the special appearance, but we affirm the trial court's summary judgment based on principles of comity.

## FACTUAL AND PROCEDURAL HISTORY

On March 10, 1976, the Mexican government awarded Telmex an exclusive concession or franchise to build, operate, and exploit a public telephone service network for a period of thirty years. On December 10, 1990, the exclusive concession was amended with a view to open the Mexican telecommunications market to competition as of January 1, 1997. The amendment to the concession required Telmex to permit its users to resell excess capacity contracted with Telmex beginning in August of 1996. The amendment, therefore, contained terms that contemplated competition in 1997; however, Telmex retained its exclusive concession for an additional six years.

In an effort to prepare itself for competition with U.S. carriers, Telmex entered into an agreement with SBI pursuant to which SBI provided advice regarding organizational issues and preparation for competition.

In October of 1992, Telmex and MCI entered into an agreement for the purpose of providing International 800 ("I800") service. The agreement provided that outbound I800 service from the U.S. to Mexico would allow callers in the U.S. to reach Telmex subscribers in Mexico at no cost to the caller. Likewise, outbound I800 service from Mexico to the U.S. would allow callers in Mexico to reach MCI subscribers in the U.S. at no cost to the callers. The agreement then set forth the rates each company would charge the other for their respective "leg" of an I800 call and contained a method for the monthly settlement between the two companies. Because Telmex was prohibited from discriminating among the various U.S. carriers, similar agreements were entered into with three other carriers, including AT & T and Sprint.

The parties dispute the nature of the arrangement between Telmex and the U.S. carriers. LDI/Star contend that the

agreement resulted in the sale of excess capacity to the U.S. carriers. Telmex's position is that the arrangement was in the nature of an interconnection agreement. Based on the agreement, the arrangement between Telmex and MCI does not appear to be one of sale, but rather one of service. Telmex agreed to provide a service to MCI by carrying the Mexican leg of a call from a Mexican caller to an MCI I800 subscriber to the border, where it was transferred to MCI's facilities, and Telmex would charge MCI the rates stated in the agreement for that service. Similarly, MCI agreed to carry the United States leg of a call from an American caller to a Telmex I800 subscriber to the border, where it was transferred to Telmex's facilities, and MCI would charge Telmex the rates stated in the agreement for that service.[2]

The parties also dispute the nature of the arrangement between MCI and its customers, like LDI/Star. LDI/Star contend that this arrangement is a resale of the Telmex excess capacity sold to MCI. Telmex contends that the I800 numbers to which MCI's customers subscribed were MCI's, and Telmex's sole involvement in the arrangement was its agreement with MCI to carry the Mexican leg of calls using MCI's I800 numbers pursuant to their agreement.

MCI had various types of customers that utilized the I800 numbers. First, MCI entered into contracts with end users, who had an I800 number and provided it to Mexican callers. The Mexican callers would use the I800 number to purchase goods or services from the end user or to otherwise contact the end user for business purposes. Examples of these types of end users are Ford, which Mexican callers would contact on its I800 number to purchase parts, and Kentucky Fried Chicken, who would subscribe to an I800 so that its regional offices in Mexico could contact its regional office in the United

---

**2.** Because we disagree with LDI/Star's reasoning that the arrangement between Telmex and MCI was a sale, we do not further consider LDI/Star's contention that its actions were the resale of excess capacity sold to MCI by Telmex.

States to provide business information. All the parties agree that the arrangement between MCI and this first type of customer was legal.

The second type of customer with which MCI entered into contracts were those who were not the end user of the I800 call, like LDI/Star. LDI/Star entered into contracts with Mexican residents, charging them for the use of an I800 number that LDI/Star obtained from MCI. The Mexican resident would call the I800 number which would provide a second dial tone that would be used to call other places. Although Telmex received payment for this call, it only received payment from MCI for the Mexican leg of the call in accordance with its agreement with MCI, despite the fact that the call did not fit within the definition of outbound I800 service as defined by that agreement. That is, the caller was being billed for the I800 call, rather than the recipient. Telmex determined that this service was a resale and was illegal under Mexican law. As a result, Telmex undertook to locate those I800 numbers that were being used for this type of service and disconnect them.

A third type of customer that entered into contracts with MCI engaged in callback services. This customer would link the I800 number to a caller identification system. The I800 call would not be connected, so that no charge was incurred for that call; however, the caller who was identified as having dialed the I800 number would receive a return call, providing the caller with a new dial tone that was used to place a call to any location. As a result, the charge that Telmex would normally receive for the Mexican leg of the I800 call would be circumvented because that call would appear to have gone unanswered.

In October of 1993, Jose Maria Rivas Moncayo, the general manager of the Office of the Secretary of Communications and Transportation ("SCT"), sent a letter to each of the U.S. carriers.

The letter stated:

This Ministry has learned that a service is being offered in Mexico to make long distance telephone calls to the United States and the rest of the world by way of using an 800 number, or a 3 "Rings" call, and receiving a callback from the United States whereby a dial tone is provided in order that the user, eluding TELMEX, can dial another part of the world or access other modalities.

This practice is illegal in Mexico, and in violation of the exclusivity provisions agreed to between the Federal Government and the TELMEX Company. Therefore, if the company you so aptly head finds itself in any of these circumstances, or has knowledge that one of your subscribers resorts to this practice, I would be very grateful if these services were suspended.

During the latter part of 1993 and early 1994, Telmex, with the assistance of SBI, began the process of identifying those subscribers of the U.S. carriers who were not end users. Telmex and SBI considered these subscribers to be engaged in resale, which was illegal under the terms of the SCT's letter and Mexican laws and regulations, and also considered them to be providing services in Mexico in violation of Telmex's exclusive concession.

In April of 1994, Telmex sent a letter to MCI, noting that it had come to Telmex's attention that services provided to MCI by Telmex were being used by MCI's subscribers for resale purposes. Telmex informed MCI that resale was prohibited in Mexico, and since none of the resellers had permits or concessions, they were in violation of the applicable telecommunications rules. The letter requested a list of MCI subscribers that engaged in the resale business. The letter stated that once the list was provided, Telmex would forward a letter to MCI explaining who would be disconnected and the scheduled range of disconnect dates.

In May of 1994, MCI responded to Telmex's letter, requesting a copy of the specific laws and regulations that prohibit re-

sale. MCI also stated that it could not provide Telmex with a list of its customers engaged in resale because such disclosure was prohibited by United States law and MCI was unclear on how resale was defined under Mexican law.

Telmex began disconnecting I800 numbers that it identified as being used for resale purposes in July of 1994. Carlos Kauachi, a Telmex executive, was identified as the person who made the decision to disconnect after many discussions with the Telmex directors and the SCT. In response to MCI's complaint that the disconnections were a surprise, Telmex responded that MCI knew of the illegal activity as early as October of 1993, when the SCT sent its notification to all U.S. carriers, and Telmex had further notified MCI in its April 1994 letter that disconnections would occur.

LDI/Star, one of MCI's subscribers whose I800 numbers were disconnected, filed the lawsuit giving rise to this appeal in June of 1996 asserting numerous causes of action, including tortious interference with contractual relations, tortious interference with prospective contractual relations, conspiracy to commit tortious interference, violations of the Texas Free Enterprise and Antitrust Act, breach of contract, and DTPA violations. Telmex filed a special appearance, challenging the trial court's jurisdiction, which was denied. SBC and SBI filed a motion for summary judgment, as did Telmex. · Each of the motions asserted various grounds for rendering judgment in their favor. A joint appendix and various motions to take judicial notice of Mexican law were filed.

The trial court granted summary judgment in favor of both SBC/SBI and Telmex as to all of the asserted causes of action. LDI/Star timely filed this appeal

### SPECIAL APPEARANCE

#### 1. Standard of Review

A nonresident defendant must negate all bases of personal jurisdiction to prevail in a special appearance. *CSR Ltd. v. Link,* 925 S.W.2d 591, 596 (Tex.1996). We review the granting of a special appearance for an abuse of discretion. *Klenk v. Bustamante,* 993 S.W.2d 677, 681 (Tex.App.—San Antonio 1998, no pet.). Under this standard, we review the trial court's legal conclusions *de novo. Id.* With regard to factual issues, however, we may not disturb a trial court's resolution of factual issues unless the trial court could reasonably have reached only one conclusion.[3] *Id.* Because the record lacks findings of fact and conclusions of law, all questions of fact are presumed to support the judgment. *Id.*

#### 2. Personal Jurisdiction Test

A court may assert personal jurisdiction over a nonresident defendant only if the requirements of both the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Texas long-arm statute are satisfied. *CSR Ltd.,* 925 S.W.2d at 594. The Texas Supreme Court has repeatedly interpreted the Texas long-arm statute to reach as far as the federal constitutional requirements of due process will allow. *Id.* Consequently, the requirements of the Texas long-arm

---

**3.** This standard was adopted by this court in *Klenk* and subsequently applied by this court in later decisions *See Magnolia Gas Co. v. Knight Equip. & Mfg. Corp.,* 994 S.W.2d 684, 689–90 (Tex.App.—San Antonio 1998, no pet.); *see also Jones v. Beech Aircraft Corp.,* 995 S.W.2d 767 (Tex.App.—San Antonio 1999, pet. dism'd). In *Transportes Aereos de Coahuila, S.A. v. Falcon,* 5 S.W.3d 712 (Tex. App.—San Antonio 1999, pet. filed.), we noted that it could be argued that the proper standard of review, even with respect to factual issues, should be *de novo.* We noted that

such an argument would be particularly persuasive in that case because the trial court had the same record to review as was presented to this court, i.e., no live testimony was introduced at the hearing that would place the trial court in a better position to evaluate credibility. We did not reconsider the proper standard of review because we found that applying the more deferential abuse of discretion standard did not affect the ultimate outcome in that case. Similarly, we do not reconsider the proper standard in this case because it would not affect its outcome.

statute are satisfied if the exercise of personal jurisdiction comports with federal due process limitations. *Id.*

The federal constitutional test of due process consists of two parts: (1) whether the nonresident defendant has purposely established "minimum contacts" with the forum state; and (2) if so, whether the exercise of jurisdiction comports with "fair play and substantial justice." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). The minimum contacts requirement is satisfied if either **general** or **specific** jurisdiction exists. *CSR Ltd.,* 925 S.W.2d at 595. In this case, the trial court ruled that no specific jurisdiction existed, but it overruled the special appearance on the basis that general jurisdiction existed.

3. General Jurisdiction

General jurisdiction is present when a defendant's contacts are continuous and systematic, permitting the forum to exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *Id.* General jurisdiction requires a showing that the defendant conducted substantial activities within the forum, a more demanding minimum contacts analysis than for specific jurisdiction. *Id.*

4. Application

The parties basically agree on the type of contacts Telmex has with Texas, but they strongly disagree as to whether those contacts are sufficient to establish general jurisdiction.

a. *Revenues from Texas residents.* LDI/Star contend that the revenues Telmex makes on calls from Texas residents to Mexican residents should be considered as a contact for purposes of the jurisdictional analysis. Telmex concedes that it makes revenues from such calls, but asserts that those revenues are pursuant to interconnection agreements with U.S. carriers. Under those agreements, the Texas residents that call Mexican residents are the customers of the U.S. carriers. The Texas residents only receive invoices from their U.S. carriers. The services Telmex performs are for the U.S. carrier pursuant to the interconnection agreements and are performed solely within Mexico.

b. *Entry into U.S. Market.* In response to the opening of competition in Mexico, Telmex explored the possibility of entering into competition in the U.S. Telmex formed an entity with a U.S. carrier through an indirect subsidiary which has filed an application with the Federal Communications Commission. Telmex retained the services of a marketing research company to conduct a market survey of Texas customers. Telmex entered into a lease for real property located in Texas. Telmex has been invoiced for personal property taxes in Texas. Telmex hired a former employee of SBC, who works in Texas on Telmex's behalf.

c. *Trademark.* Telmex has filed applications to protect various trademarks. An attorney representing Telmex sent a letter to a Texas corporation, demanding that it cease infringing on Telmex's trademark.

d. *Securities.* Telmex has registered securities that are sold in the U.S.

e. *Agreement with SBI.* Pursuant to its agreement with SBI, various SBC employees have transferred to Mexico to provide consulting services to Telmex.

We agree with Telmex that some of the contacts relied on by LDI/Star are not relevant to the jurisdictional issue; however, we conclude that general jurisdiction is supported by the record as a whole, including: (1) the activities undertaken by Telmex in its efforts to enter into competition in the U.S., which include: (a) the retention of the market research firm; (b) the employment and actions of Telmex's employee in Houston; and (c) the lease of real property in Texas and the location of personal property in Texas; and (2) the demand letter with regard to the trade-

mark infringement. Telmex's cross-appeal is overruled.

## SUMMARY JUDGMENT STANDARD OF REVIEW

A defendant moving for summary judgment has the burden of establishing that no genuine issue of material fact exists as to one or more essential elements of the plaintiff's cause of action and that the defendant is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). If the defendant meets this burden, the plaintiff must then raise a genuine issue of material fact on the targeted element of the plaintiff's cause of action. *Gonzalez v. City of Harlingen,* 814 S.W.2d 109, 112 (Tex.App.—Corpus Christi 1991, writ denied).

In reviewing a summary judgment, an appellate court accepts as true all evidence supporting the non-movant. *Nixon,* 690 S.W.2d at 549. All inferences are indulged in favor of the non-movant, and all doubts are resolved in his favor. *Id.* Where, as here, the trial court does not state the grounds for granting the motion, and several grounds are provided, the reviewing court must determine if any of the grounds would support the judgment. *Rogers v. Ricane Enters., Inc.,* 772 S.W.2d 76, 79 (Tex.1989).

## LEGALITY OF RESALE SERVICE

One of the grounds raised in both of the motions for summary judgment is that LDI/Star cannot recover under any of their asserted causes of action because their actions were illegal under Mexican law. Telmex and SBC/SBI presented numerous documents and the testimony of an expert to support the assertion that LDI/Star's activities were illegal, including: (1) the notification from the SCT to U.S. carriers regarding the illegality of call-back resale activities; (2) the Mexican telecommunications laws and regulations and the terms of the exclusive concession granted Telmex that precludes the provision of telecommunications services in Mexico without a permit or concession; and (3) the declaration (opinion) of Francisco Manzanero; and (4) a letter dated June 6, 1996, to all the director generals of SCT centers regarding the illegality of the provision of long distance services by means of alternate call procedures, such as access using 800 numbers. LDI/Star rely on the deposition testimony of Elvia Salas de de Stefano ("Salas") and a letter from the SCT dated February 2, 1996 to support their contention that their actions were not illegal.

No action will lie to recover damages if the recovery requires the showing of an illegal transaction or unlawful action to which the plaintiff was a party. *Duncan Land & Exploration, Inc. v. Littlepage,* 984 S.W.2d 318, 328 (Tex. App.—Fort Worth 1998, pet. denied); *Saks v. Sawtelle, Goode, Davidson & Troilo,* 880 S.W.2d 466, 469 (Tex.App.—San Antonio 1994, writ denied). Similarly, a contract that is illegal or a contract to do a thing that cannot be performed without violating a law cannot be interfered with. *Juliette Fowler Homes, Inc. v. Welch Associates, Inc.,* 793 S.W.2d 660, 664–65 (Tex. 1990); *Robles v. Consolidated Graphics, Inc.,* 965 S.W.2d 552, 561 (Tex.App.—Houston [14th Dist.] 1997, pet. denied); *Ralston Purina Co. v. McKendrick,* 850 S.W.2d 629, 638–39 (Tex.App.—San Antonio 1993, writ denied). A contract made with a view of violating the laws of another country, though not otherwise obnoxious to the laws either of the forum or of the place where the contract was made, is illegal and will not be enforced. *Ralston Purina Co.,* 850 S.W.2d at 639. If a prospective contract is unenforceable because it is void, the unenforceability of the contract provides a defense to a tortious interference claim. *Id.*

Under the laws of Mexico, if LDI/Star were providing telecommunications services in Mexico, their actions would be illegal because they did not have a permit or concession. *See* LEY FEDERAL DE TELECOMMUNICACIONES, Capítulo III, Sección I, Artículo 11 (concession from Department

required to install, operate or exploit public telecommunications network); REGLAMENTO DE TELECOMMUNICACIONES, Capitulo II, Articulo 6a (to install, establish, operate and exploit telecommunications services, it shall be necessary to obtain a concession or permit from the Federal Executive). Moreover, they could not have been given such a permit or concession until August of 1996, when Telmex's exclusive concession expired. The parties disagree, however, on whether LDI/Star's activities involved the provision of services in Mexico.

LDI/Star's expert concluded that LDI/Star did not provide services in Mexico because the actual telecommunications service from the Mexican customer was carried to the border by Telmex in accordance with its interconnection agreement with MCI. MCI would then continue to service from the border to LDI/Star's switch in accordance with its agreement with LDI/Star, and LDI/Star would then continue service from its switch to the call's termination point in accordance with its agreement with its subscriber, who was a Mexican resident. However, the testimony of LDI/Star's owner, Tomas Revesz, refutes Salas's premise that LDI/Star did not provide its services in Mexico. Revesz testified that LDI/Star solicited Mexican residents as subscribers through telemarketers and salespeople in Mexico. LDI/Star programmed its 1800 numbers into the subscribers' equipment, which numbers enabled the subscribers to access a switch which was used to transfer the calls to their termination point. LDI/Star billed the Mexican customer for this service. This service was unlike the services provided under the interconnection agreements with U.S. carriers. Under those agreements, the U.S. carriers would only solicit U.S. customers, the Mexican residents were Telmex's subscribers or users, and the only entity that billed the Mexican residents was Telmex.

Our reading of the Mexican laws is consistent with the SCT interpretations. Telmex and SBC/SBI introduced the letter from the SCT to all U.S. carriers dated October 1993, stating that callback services were illegal in Mexico and in violation of Telmex's exclusive concession. In addition, Telmex and SBC/SBI introduced the June 1996 letter to the director generals of SCT centers, stating that providing international long distance services by means of alternate call procedures, such as access using 800 numbers, return call systems known as "call back," automatic direct dial to preset numbers using some other similar or equivalent procedures with the same purpose, is outside the legal provisions established by the Federal Law on Telecommunications. Telmex and SBC/SBI assert that these letters should be given the same deference that courts give to interpretations of law by regulatory agencies that administer and enforce those laws. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Telmex and SBC/SBI further assert that this deference is even more applicable in the case of an interpretation by a foreign nation of its laws, as a matter of international comity.

Comity is a principle under which the courts of one jurisdiction give effect to the laws of another jurisdiction not as a rule of law, but rather out of deference or respect. *See Hawsey v. Louisiana Dept. of Social Services,* 934 S.W.2d 723, 726 (Tex.App.—Houston [1st Dist.] 1996, writ denied); *see also Brady v. Brown,* 51 F.3d 810, 816 (9th Cir.1995) (comity based on respect for sovereignty of other countries and under its forum state applies substantive law of foreign sovereign). In the legal sense, it is neither a matter of absolute obligation, on the one hand, nor mere courtesy or good will, upon the other. *Gannon v. Payne,* 706 S.W.2d 304, 306 (Tex.1986). It is one jurisdiction's recognition of the legislative, executive or judicial acts of another jurisdiction. *Id.*

Having reviewed the relevant Mexican laws and regulations and the SCT interpretations, which are consistent with our review of those laws, we conclude that the actions undertaken by LDI/Star were ille-

gal.[4] *See* LEY FEDERAL DE TELECOMMUNICACIONES, Capítulo III, Sección I, Artículo 11 (concession from Department required to install, operate or exploit public telecommunications network); REGLAMENTO DE TELECOMMUNICACIONES, Capítulo II, Artículo 6a (to install, establish, operate and exploit telecommunications services, it shall be necessary to obtain a concession or permit from the Federal Executive). As a result, LDI/Star cannot recover under any of their asserted claims. *See Littlepage,* 984 S.W.2d at 328; *Saks,* 880 S.W.2d at 469. The trial court's summary judgment in favor of Telmex and SBC/SBI as to all causes of action is affirmed.

---

**4.** Although LDI/Star seek to rely on a separate SCT letter dated February 2, 1996, that letter relates only to Telmex's authority to interrupt services to its "users." The "users" contemplated by that letter are those who necessarily have entered into service agreements with Telmex pursuant to which they pay Telmex fees for such services. No service agreement existed between LDI/Star and Telmex; therefore, LDI/Star was not a "user" to which the SCT letter refers, and LDI/Star's reliance on this letter is misplaced.