**BRIDAS CORPORATION, Appellant,**

v.

**UNOCAL CORPORATION, Delta Oil Corporation Ltd., Delta International, and Deltoil Corporation, Appellees.**

No. 14–99–00196–CV.

Court of Appeals of Texas, Houston (14th Dist.).

April 27, 2000.

Patricia A. Hill, Murray Fogler, George P. Hardy, III, William P. Maines, Paula K. Hutchinson, Houston, Susan Lea Hays, Dallas, Michael E. Orsak, Thomas R. McDade, Houston, for appellant.

Randall W. Wilson, William W. Ogden, Phillip T. Bruns, Jeffrey C. Alexander, Houston, for appellees.

Panel consists of Chief Justice MURPHY, Justices HUDSON, and WITTIG.

## O P I N I O N

DON WITTIG, Justice.

The principle issue presented is choice of law. The trial court found that Turkmenistan and Afghanistan law applied to the tortious interference claims. Based upon the application of those foreign laws, the trial court also granted summary judgment because no such interference claims exist in situs of the alleged injuries. We affirm.

Bridas Corporation ("Bridas") appeals from a summary judgment granted in favor of Unocal Corporation, Delta Oil Company Ltd., Delta International, and Deltoil Corporation (collectively as "Unocal"). Bridas brought this action against Unocal, alleging civil conspiracy and tortious interference with existing and prospective contractual relationships between Bridas and the governments of Turkmenistan and Afghanistan. Unocal moved for summary judgment on the grounds that (1) the laws of Turkmenistan and Afghanistan applied and that the laws of those nations did not recognize the causes of action alleged by Bridas, and (2) under Texas law, all of the claims alleged by Bridas failed as a matter of law. Judge Brady Elliott conducted an

extensive and exhaustive eight-day evidentiary hearing consisting primarily of expert testimony on the choice of law issue. The trial court then granted a summary judgment in favor of Unocal. It found that the laws of Turkmenistan and Afghanistan applied to this matter and could be readily determined. The trial court also found that the laws of those nations did not recognize a cause of action for tortious interference or civil conspiracy. On appeal, Bridas presents three issues for appellate review, oppugning whether (1) the trial court erred in determining that foreign law rather than Texas law applied, (2) the trial court erred in determining that the laws of Turkmenistan and Afghanistan could be determined with certainty and predictability, and (3) the court was legally correct that Turkmen and Afghan law did not recognize the causes of action alleged by Bridas.

## BACKGROUND

Turkmenistan became an independent nation upon the collapse of the Soviet Union in late 1991. It is located north of Afghanistan and northeast of Iran; its western border abuts the Caspian Sea. Turkmenistan is a nation that possesses vast hydrocarbon reserves. It began entertaining offers to develop its natural resources in late 1991. Subsequently, Bridas entered into agreements to develop hydrocarbons located in the regions of Turkmenistan known as the Yashlar Field and the Keimir Field. Exploratory drilling by Bridas in the Yashlar Field resulted in the discovery of a natural gas reserve containing an estimated 27 trillion cubic feet of gas, for which Turkmenistan had no domestic need. However, Pakistan did have a domestic need for the gas and executed an agreement with the government of Turkmenistan to purchase gas for a period of thirty years. To deliver the gas, Bridas intended to construct and operate a pipeline from Turkmenistan to Pakistan. To reach Pakistan, it would have been necessary for the proposed pipeline to travel through central Afghanistan.

Bridas contacted Unocal in 1995 to determine whether Unocal would be interested in participating in the development of hydrocarbon projects in Turkmenistan. Indeed, Bridas extended an invitation to Unocal to join its proposed project of constructing and operating the pipeline from Turkmenistan to Pakistan. However, no agreements were made between Bridas and Unocal.

Later in 1995, Turkmen officials traveled to Houston and made a presentation at a meeting hosted by the Greater Houston Partnership. Their presentation concerned petroleum opportunities in Turkmenistan and the need for export pipelines, specifically referencing the development of a gas pipeline from Turkmenistan to Pakistan. Following the meeting, Turkmen officials held private meetings with many companies, including Bridas and Unocal.

During the Summer of 1995, Bridas and Unocal, separately attempted to obtain a contract with the government of Turkmenistan to construct the pipeline. Several proposals offered by Bridas to build the pipeline were rejected by Turkmenistan. However, in the Fall of 1995, Unocal was successful in obtaining an agreement with the Turkmenistan government to construct the gas pipeline. The agreement provided that Unocal would construct the pipeline, that it would purchase gas from Turkmenistan at the Afghan border, and that Turkmenistan would retain the right to select gas reserves to dedicate to the project.

Bridas then attempted to obtain an exclusive agreement with Afghan officials to allow Bridas to construct all pipelines on Afghan territory. Afghanistan's recent political history shows that the country has experienced much instability. After the Soviet Union withdrew its military presence in 1989, a civil war erupted in Afghanistan. The country became divided and controlled by various factions. One faction was controlled by Barhanuddin Rabbani, who controlled less than half the

country. In early 1996, Bridas payed Rabbani $1 million in exchange for an agreement which purported to confer upon Bridas all rights to construct pipelines on Afghan territory. Thereafter, another faction forced Rabbani out of the Afghan capital city of Kabul and into the northeastern corner of the country.

Unocal made several attempts with various other Afghan factional leaders to reach an agreement for the construction of a pipeline through Afghanistan. However, Unocal was unable to obtain the right-of-ways it needed. In January 1999, Unocal announced it was withdrawing from the Pakistan pipeline project.

During the respective efforts by Bridas and Unocal to gain the needed right-of-ways in Afghanistan, the government of Turkmenistan unilaterally terminated its agreements with Bridas, which had allowed Bridas to develop and market hydrocarbons in the Yashlar Field and Keimir Field. The government of Turkmenistan sought to renegotiate its agreements with Bridas to gain more favorable terms. Bridas responded by filing an arbitration proceeding in Turkmenistan against the government of Turkmenistan.

Bridas then filed this lawsuit against Unocal, alleging that Unocal tortiously interfered with an existing and prospective contractual relationship between Bridas and the governments of Turkmenistan and Afghanistan; Bridas also alleged civil conspiracy against Unocal. Bridas sought to recover approximately $15 billion from Unocal. The trial court granted Unocal's motion for summary judgment based upon its choice of law findings. Specifically, it found that the laws of Turkmenistan and Afghanistan applied in this case and that the laws of those countries did not recognize the causes of action alleged by Bridas.

### STANDARD OF REVIEW

■ Summary judgment is proper when a movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

*See American Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997); *Ahumada v. Dow Chemical Co.,* 992 S.W.2d 555, 558 (Tex.App.-Houston [14th Dist.] 1999, pet. filed). In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true, resolving all doubts and indulging all reasonable inferences in favor of the non-movant. *See id.; Ahumada,* 992 S.W.2d at 558.

■ Further, Rule 203 of the Texas Rules of Evidence provides that "[t]he court, and not a jury, shall determine the laws of foreign countries." TEX.R. EVID. 203. Rule 203 also provides that "the court's ruling shall be subject to review as a ruling on a question of law." *Id.* Rule 203 is a hybrid rule by which presentation of the law to the court resembles presentment of evidence, but which the court ultimately decides as a matter of law. *See Ahumada,* 992 S.W.2d at 558; *Gardner v. Best Western Int'l, Inc.,* 929 S.W.2d 474, 483 (Tex.App.-Texarkana 1996, writ denied). The determination of the law of a foreign country may present the court with a mixed question of law and fact. *Id.* Summary judgment is not precluded when experts disagree on the interpretation of the law if, as in this case, the parties have not disputed that all of the pertinent foreign law was properly submitted in evidence. *Id.* Where experts disagree on application of the law to the facts, the court is presented with a question of law. *Id.* at 558–59. On appeal, we must determine whether the trial court reached the proper legal conclusion. *Id.; see also Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex.1984); *Salazar v. Coastal Corp.,* 928 S.W.2d 162, 166 (Tex.App.-Houston [14th Dist.] 1996, no writ).

### DISCUSSION

#### Choice of Law

In its first issue presented for review, Bridas questions whether the trial court erred in determining that the laws of

Turkmenistan and Afghanistan applied to its tort claims against Unocal rather than the laws of Texas. The Texas Supreme Court has identified the choice of law principles applicable to tort claims, stating that

> [I]t is the holding of this court that in the future all conflicts cases sounding in tort will be governed by the "most significant relationship" test as enunciated in Sections 6 [1] and 145 [2] of the RESTATE-MENT (SECOND) OF CONFLICT [OF LAWS]. This methodology offers a rational yet flexible approach to conflicts problems. It offers the courts some guidelines without being too vague or too restrictive. It represents a collection of the best thinking on this subject. . . .

*Gutierrez v. Collins,* 583 S.W.2d 312, 318 (Tex.1979) (footnotes added); *see also CPS Int'l, Inc. v. Dresser Indus., Inc.,* 911 S.W.2d 18, 28–9 (Tex.App.-El Paso 1995, writ denied). We therefore apply section 145 to the facts of the instant case. Before we begin our section 145 analysis, however, we turn to section 156 of the RESTATEMENT for guidance as to the relative importance of the four factors identified in section 145. Section 156 provides the following:

Tortious Character of Conduct

(1) The law selected by application of the rule of § 145 determines whether the actor's conduct was tortious.

(2) *The applicable law will usually be the local law of the state where the injury occurred.*

RESTATEMENT (SECOND) CONFLICT OF LAWS § 156 (1971)(emphasis added). Thus, the RESTATEMENT reveals an emphasis on the situs of the injury, at least with respect to the application of section 145. *See CPS Int'l, Inc.,* 911 S.W.2d at 29. Accordingly, it is this factor that we first analyze.

■ There is little dispute that the places where the injuries alleged by Bridas occurred are in the nations of Turkmenistan and Afghanistan. That is, the contractual or prospective relationships that Bridas alleges Unocal interfered with are centered in Turkmenistan and Afghanistan. Specifically, Bridas alleges that as a result of Unocal's interference with its contractual and prospective relationships with foreign governments, it has been prevented from constructing and operating a gas pipeline originating in Turkmenistan,

1. Section 6 sets forth the general principles by which the more specific rules are to be applied, and provides the following:

Choice-of-law Principles

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

2. Section 145 lists factual matters to be considered when applying the principles of section 6 to a tort action, and provides the following:

The General Principle

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

traveling through Afghanistan, and ending in Pakistan. While Bridas argues in its brief, without citing any supporting authority, that "where the injury occurred provides no guidance whatsoever in determining what ... law should apply," we nevertheless find that the first contact we consider in employing the "most significant relationship" test strongly favors an application of foreign law. See RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971); see also CPS Int'l, Inc., 911 S.W.2d at 29.

The second contact we consider under section 145 is the place where the conduct causing the injury occurred. See id. Bridas contends that "the great majority of the conduct causing the injury occurred in Texas." Bridas asserts that the "officers directing the project [for Unocal] were based [in Sugar Land, Texas]." As to this contact, we find the facts in CPS Int'l, Inc. to be indistinguishable. See 911 S.W.2d at 29–30. Realizing this, Bridas argues that we should "reject" the holding in CPS Int'l, Inc. because it leads to an "unjust if not astonishing result...." We disagree. In CPS Int'l, Inc., the plaintiff alleged that the defendants tortiously interfered with a contractual relationship between the plaintiff and a private Saudi Arabian party to perform field servicing in Saudi Arabia. Id. The plaintiff argued, unsuccessfully, that Texas law applied to its cause of action because the conduct alleged to be tortious was directed from Texas. Id. at 30. The court of appeals held "that tortious conduct may have been directed from Texas does not alter the reality that the conduct was directed to and carried out in Saudi Arabia, and it was the carrying out of the conduct that the was the source of its harmful nature." Id. Thus, the court found that the second contact under section 145 favored the application of Saudi Arabia law. Id.

While we agree with the analysis in CPS Int'l, Inc., we also note the following factors in this case that favor the application of foreign law under the second contact

identified in section 145 of the RESTATEMENT (SECOND) CONFLICT OF LAWS. First, the chief operating officer for Bridas, Glen Nelle, unequivocally acknowledged in his deposition testimony that the alleged interference by Unocal occurred in Turkmenistan. Second, in his affidavit in support of the summary judgment, Marty Miller, Vice–President of New Ventures in central Asia for Unocal, stated

I was the principal negotiator for Unocal Corporation. The June Protocol, the Gas Contract and the Oil Protocol were all negotiated in Turkmenistan, not in Texas. Both protocols and the Gas contract were negotiated in face-to face meetings in Turkmenistan and not through conference calls or other less personal means of communication. In 1995, I traveled to Turkmenistan on four separate occasions to negotiate these agreements with the Government of Turkmenistan.

Assuming arguendo that any communication was made by Unocal with Turkmen or Afghan officials from Texas soil, concerning the construction and operation of a gas pipeline, we find that the record supports a finding that such communication does not favor the application of Texas law. We are required to consider the qualitative nature of the contacts under section 145 of the RESTATEMENT (SECOND) CONFLICT OF LAWS. See Gutierrez, 583 S.W.2d at 319. In this connection, the record shows that the most significant acts alleged to be tortious by Bridas occurred on Turkmenistan soil. Accordingly, under the second contact of the "most significant relationship test," we find that it favors the application of foreign law.

The third contact we consider under section 145 is the parties' respective places of incorporation and places of business. Bridas is incorporated in the British Virgin Islands and is based in Buenos Aires, Argentina. Before beginning its operations in Turkmenistan, Bridas formed a joint venture agreement with the Turkmenistan government, presumably under Turkmen

law, to develop hydrocarbons; the name of the joint venture was "Joint Venture Yashlar." Unocal is a Delaware corporation headquartered in California. The Delta entities are incorporated in Delaware, the Channel Islands, and the Kingdom of Saudi Arabia; their principal place of business is in Jeddah, Saudi Arabia. While each of the parties maintains an office in Sugar Land or Houston, none is a Texas corporation. Each of the parties also maintain an office in Ashgabat, Turkmenistan. According to Comment *e*, relating to the contacts considered under section 145 of the RESTATEMENT (SECOND) CONFLICT OF LAWS, this third contact is of little significance when the action is based upon a business or financial interest or interference with contractual relations. In any event, while this contact appears to be largely neutral, we find that it favors the application of foreign law.

The foregoing analysis of the first three contacts in section 145 does much to foretell the outcome of the analysis of the fourth, and final, contact. Indeed, we think it rare that the injury, the conduct producing it, and the parties' places of incorporation and business would point to the same foreign jurisdiction, yet the relationship would somehow be centered in Texas. *See CPS, Int'l, Inc.*, 911 S.W.2d at 30. Although we do not trivialize the final contact in section 145, we find it potentially duplicative of an analysis of the first three, which finding is supported by the recognition, present in the language of section 145(2)(d) itself, that analysis of an extant relationship will only be intermittently possible. *Id.* In any event, the record in this matter reveals that no contractual nor business relationship existed between Unocal and Bridas at the time Bridas filed its suit; particularly, not in Texas. Nonetheless, to the extent any relationship existed between them, it was centered in foreign territory where the hydrocarbons were located and from where the pipeline was to be constructed. We conclude that the final contact under section 145 of the RESTATE-MENT (SECOND) CONFLICT OF LAWS favors the application of foreign law.

We find that both the quantity and quality of the contacts identified in section 145 mandates the application of foreign law to all tort claims asserted by Bridas because the parties and the subject matter of this litigation have a more significant relationship to the nations of Turkmenistan and Afghanistan than to Texas.

As a final matter, relying on section 6 of the RESTATEMENT (SECOND) CONFLICT OF LAWS, Bridas contends that Texas should apply to this action because "Texas has a substantial public policy interest in regulating the conduct of persons doing business within its borders." *See* note 1, *supra.* Bridas also contends that Texas law should apply because of the difficulty in ascertaining and predicting Turkmen and Afghan law. The latter contention is addressed below. Concerning the former, we note that Bridas chastises the court in *CPS Int'l, Inc.* for reaching its conclusion without analyzing and ignoring altogether the policy factors contained in section 6 of the RESTATEMENT (SECOND) CONFLICT OF LAWS. However, our reading of *CPS Int'l, Inc.* reveals an analysis of the public policy considerations identified in section 6. *See* 911 S.W.2d at 33–34. The court stated the following:

Section[ ] 6 ... of the RESTATEMENT do[es] not alter our conclusion that Appellants' tort claims are governed by Saudi Arabian law. These sections direct courts to consider the policies of the forum. Whether or not Texas has an important policy interest in policing the conduct of subsidiaries of businesses with Texas offices that occurs outside Texas and has no effect on its territory, this is only one of several factors listed in Section 6. Further, Section 145 of the RESTATEMENT directs us to consider Section 6 factors in light of the specific contacts listed in Section 145. * * * In a discussion of the fundamental state policy exception to the general rule of Section 187(2) [of the RESTATEMENT, con-

cerning contractual rights], which we emphasize is irrelevant, the Texas Supreme Court indicated the exception's narrow scope.

> Comment *g* to section 187 does suggest that application of the law of another state is not contrary to the fundamental policy of the forum merely because it leads to a different result than would obtain under the forum's law. We agree that the result in one case cannot determine whether the issue is a matter of fundamental state policy for purposes of resolving a conflict of laws. Moreover, **the fact that the law of another state is materially different from the law of this state does not itself establish that application of the other state's law would offend the fundamental policy of Texas.** In analyzing whether fundamental policy is offended under section 187(2)(b), the focus is on whether the law in question is a part of state policy so fundamental that the courts of the state will refuse to enforce an agreement contrary to that law, despite the parties' original intentions, and even though the agreement would be enforceable in another state connected with the transaction.

*DeSantis [v. Wackenhut Corp. ]*, 793 S.W.2d 670, 680 [ (Tex.1990), *cert. denied*, 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991) ] (emphasis added). We think this indication of the narrowness of the fundamental *policy exception in Section 187(2) applicable to tort claims examined under Section 145 to the extent Section 145 directs courts to consider the policies of the forum and other interested states as directed by Section 6.* We therefore approach Sections 6(2)(b) and 6(2)(c) with the presumption that they will rarely be dispositive.

There is no evidence to suggest the trial court failed to consider or attributed too little weight to the public policy of Texas. We have examined the relationships among the parties, Texas, Saudi Arabia, and the subject matter of this litigation pursuant to the RESTATEMENT and concluded that the parties and this litigation have the most significant relationship to Saudi Arabia.

*CPS Int'l, Inc.*, 911 S.W.2d at 34 (emphasis added).

We agree with the court in *CPS Int'l, Inc.* in its core holdings. We hold that the legal conclusion identified in the trial court's summary judgment relating to the application of foreign law in this action is proper. Accordingly, we overrule the Bridas' first issue presented for review.

### Content of the Foreign Law

In its final two issues presented for review, relying in part upon section 6 of the RESTATEMENT, Bridas questions whether the trial court erred in determining that the laws of Turkmenistan and Afghanistan could be readily and predictably ascertained and that neither of those nations recognized the tort actions alleged by Bridas.

#### a. Turkmenistan

■ Concerning the content and predictability of Turkmenistan law, Unocal presented testimony from three expert witnesses to support the contention in its motion for summary judgment that Turkmenistan law did not recognize the tort causes of action alleged by Bridas. The first witness was Professor Sarah Reynolds. Professor Reynolds holds a position at Lieden University and the Davis Center for Russian Studies at Harvard University Law School. She is also a former law school professor at Harvard University Law School, where she taught Soviet law. She also taught classes on the legal systems of the now independent republics of the former Soviet Union. She testified that Turkmenistan operates under a civil code system of law, as opposed to the common law system followed in the United

States.[3] After the collapse of the Soviet Union, Turkmenistan continued to operate under its civil code, which was promulgated by the Soviet Union and has been in effect, as amended, since 1964. Professor Reynolds testified that the Turkmenistan Civil Code does not provide any specific statute nor general provision to permit a cause of action for tortious interference or civil conspiracy. She testified that Article 445 of the civil code is the general tort claims provision of the Turkmenistan Civil Code. Article 445 provides the following:

> Harm caused to the person or property of a citizen, and also harm caused to an organization, is subject to compensation by the person causing the harm, in full measure, with the exception of the instances envisioned in the legislation of the USSR.
>
> The causer of the harm shall be released from its compensation is he shows that the harm was not caused by his fault. Harm caused by legal actions shall be subject to compensation only in the instances envisioned in legislation.

Professor Reynolds testified that the four elements of Article 445 are (i) the occurrence of harm to person or property, (ii) a causal connection between the action (omission) of the respondent and the harm, (iii) the unlawful nature of the action (omission) of the respondent, and (iv) fault on the part of the respondent (in the form of intent or negligence). She testified that the allegation by Bridas of tortious interference with an existing or prospective contract does not satisfy the first element of Article 445 because the harm suffered must encompass harm to life or health of a person, land, or tangible property. She testified that the allegations by Bridas also fail to satisfy the second element of Article 445 because the causal connection between the conduct and the harm must be a direct one. In other words, the harm Bridas suffered, if any, was caused directly by the Turkmenistan government by not honoring its contractual promises to Bridas; and Unocal's involvement in causing the harm, if any, was indirect. Professor Reynolds further opined that the allegations by Bridas failed to satisfy the third element of Article 445 because the conduct of Unocal in entering into a contract with the Turkmenistan government was lawful. That is, the act of entering into contract is not an illegal act. Because the first three elements of Article 445 were not satisfied, Professor Reynolds testified that a discussion of the fourth element would not be necessary because a Turkmenistan court would dismiss the action prior to addressing the issue of fault. Concerning the allegation of civil conspiracy, Professor Reynolds testified that "[t]here is nothing remotely similar to a civil conspiracy claim under the Turkmen system." She concluded that "[n]one of the allegations that I read in the petitions constituted an illegal act or unlawful act under Turkmen law."

The next expert witness presented by Unocal was Professor Sergei Lebedev. Professor Lebedev is a professor of law at the Moscow Institute of International Relations. He is also head of the private international and civil law department at the university. Professor Lebedev has published more than 150 books, articles and surveys on legal matters of international commerce, comparative law, arbitration, and international law. Professor Lebedev is also an arbitrator, hearing cases throughout Europe. He testified that six months prior to his testimony in this case he was involved in a Russian arbitration matter in which he had to apply Turkmenian law. Professor Lebedev testified that he reviewed the allegations contained in Bridas's petition and carefully studied the Turkmenistan Civil Code and commentaries before reaching his conclusion in this case. When asked whether the allegations made by Bridas were valid under Turkmen law, Professor Lebedev stated, "My answer is negative." He further testified that he agreed with the findings made by

---

**3.** Except the State of Louisiana, which has followed a civil code system.

Professor Reynolds concerning the application of Article 445 to the allegations made by Bridas.

The final witness presented by Unocal bearing upon Turkmenistan law was Professor Murad Khaitov. Professor Khaitov is a professor of constitutional and international law at the Turkmen State Institute. He testified extensively about the structure of the Turkmen court system and how judges are selected. The Turkmen judiciary is comprised of several trial courts and courts of review. Judges are appointed to the bench; the highest level judges are appointed by the president with a preliminary agreement between the president and the parliament; and all other judges are appointed by the president upon recommendation of the highest level court. In his expert opinion, Professor Khaitov stated that the laws in Turkmenistan are applied by the judiciary to all disputes, no matter the parties, in an evenhanded fashion. Lastly, Professor Khaitov testified that in his expert opinion, the judiciary in Turkmenistan operates independently of the country's political elite.

Concerning the content and predictability of Turkmenistan law, Bridas presented two witnesses. Its first witness was Joseph Hulings. Hulings was the first United States Ambassador to Turkmenistan. He began his ambassadorship in August 1992, shortly after the collapse of the Soviet Union and Turkmenistan became an independent nation. Hulings remained the United States Ambassador to Turkmenistan for a period just over three years. Hulings testified that, based upon his experiences in Turkmenistan, the judiciary does not operate independently nor is there any rule of law in Turkmenistan. Based upon his assessment of the political atmosphere and the influence of the president on judicial actions, Hulings opined that the predictability of the law or certainty of the result of an action governed by Turkmenistan law would be purely speculative.

Next, Bridas presented expert testimony from Professor Michael Newcity. He is the coordinator for the Center for Slavic, Eurasian and East European Studies at Duke University School of Law. Professor Newcity teaches a course at the law school on the legal aspects of doing business in the former Soviet Union. He testified that the Turkmenistan Civil Code is derived from the Russian Civil Code. In reaching his conclusion that Turkmenistan law would recognize the tort causes of action alleged by Bridas, Professor Newcity reviewed the applicable Soviet and Turkmenistan legal provisions and the relevant pleadings on file in this case. Professor Newcity's opinion was based, in part, upon his conclusion that because (1) Turkmenistan was in process of evolving into a market economy, its laws would need to adjust accordingly to protect entrepreneurs actively participating in that economy, and (2) the issue of whether Turkmenistan would truly recognize a cause of action for interference with a business relationship is one of first impression, having never been squarely addressed by a Turkmenistan court. Finally, Professor Newcity opined that, given the changed conditions in the post-Communist world of the former Soviet Union, Article 445 of the Turkmenistan Civil Code, as written, theoretically should be interpreted to provide a remedy for interference with business relations. He reasons that the concept of "property," identified in article 445, contemplates a business relationship and loss of profits.

Regarding the *present* interpretations and state of the law in Turkmenistan, none of the experts disagree that the specific tort causes of action alleged by Bridas against Unocal are not recognized. Professor Newcity, presented by Bridas, suggests that given the changed economy and other conditions occurring Turkmenistan, its courts "should" interpret Article 445 of the Turkmenistan Civil Code to provide a remedy for the actions alleged by Bridas. However, Professor Newcity's opinion is conjecture. In reaching our decision, we

can be concerned only with the present scope of Turkmenistan law.

Though the expert witnesses in this case disagree on the interpretation and predictability of Turkmenistan law, we conclude that the evidence presented by Unocal shows that Turkmenistan law is readily and reliably ascertainable and that it does not presently recognize the tort causes of action alleged by Bridas. *See Ahumada,* 992 S.W.2d at 558–59. Accordingly, the trial court's finding that Unocal was entitled to judgment as a matter of law was the proper legal conclusion.

*b. Afghanistan*

■ Concerning the content and predictability of Afghanistan law, Unocal presented testimony from four expert witnesses to support the contention in its motion for summary judgment that Afghanistan law did not recognize the tort causes of action alleged by Bridas. The first witness was Professor Ian David Edge. Professor Edge is a law professor at the University of London, a practicing barrister in London, and a consultant on the laws of the Middle East, Islamic Law.

Professor Edge testified that the country of Afghanistan follows a very well-established Islamic system of law, purely non-secular. More specifically, Afghanistan follows the law of the Hanafi school of Islamic law. The traditional rules of Islamic law are referred to as the Shari'a. Professor Edge testified that there is no government legislation nor judicial precedent in the Afghan legal system. Further, Islamic law is interpreted not by judges but, rather, religious scholars. The two main written sources of Islamic law are the Qur'an[4] and the Sunna. Another written source of Islamic law is the *Mejelle.*

According to Professor Edge, the compilation of the *Mejelle* was an official attempt by the Ottoman Empire[5] to distill some of the most important civil principles (transactions between people) of Islamic law. Afghanistan also has a civil code that was promulgated in the 1960s, utilized only by the Shari'a courts in the northern region of Afghanistan. Professor Edge testified that the Afghan civil code is quite similar a collection as the *Mejelle;* that is, it is a collection of important principles taken from the Hanafi or Shari'a. Concerning the application of these laws and the administration of justice generally, Professor Edge testified that Afghanistan courts function autonomously and quite effectively, even in the face of ongoing civil unrest.

Upon reviewing various sources of Afghan law and commentaries, Professor Edge opined that Afghan law does not recognize a cause of action for tortious interference or civil conspiracy. He testified that the Shari'a provides for a tort-like cause of action only when physical injury has occurred to a person or property. He stated that because interference with an existing or prospective contractual relationship does not relate to tangible property or a person, no cause of action exists under the Shari'a. Professor Edge also testified that the Sahri'a requires that for liability to attach to a person, the harm caused must be direct and that the causation principles are strict. In other words, ordering a person to break a contract with another person does not make the person making the order liable because there is no causation as to the person giving the order under the Shari'a. Support for his conclusion, Professor Edge noted, is found in Articles 89[6] and 1510 of the *Mejelle.* Article 89 provides the following:

4. Also known as "Koran."

5. The Ottoman Empire was the last holy empire that governed in the Middle East from 1517 to 1918.

6. *Compare* Afghanistan Civil Code Article 787: "Action shall relate to the actor, not the com-

mander, except when the actor is intimidated. In actions, only complete aversion shall be recognized as credible force majeure." Article 551 of the Afghanistan Civil Code defines "aversion" as "intimidation of a person, unreasonably for executing an action without consent whether it may be material or spiritual."

The judgment for an act is made to fall on the person who does it. And it does not fall on the person who gives the order, as long as he does not compel the doing of the act.

Article 1510 provides the following, including an example to illustrate:

The order of a person is lawful in respect of his own property only.

Therefore, is someone says to another, "Throw this property into the sea," and the person who receives the order, throws it, knowing that the property belongs to someone else, the owner can enforce compensation for that property from the person who threw it. Nothing is necessary for the person who gave the order, so far as he has not used force.

Lastly, Professor Edge testified that under Article 91 of the *Mejelle*, a "harm" is not compensable under the Shari'a if it resulted from a lawful act. He stated that "entering into a contract is a lawful act, which, even if it causes harm to somebody else, doesn't result in liability." Consequently, according to Professor Edge, because Unocal's act of entering into a contract with the Afghanistan government was a lawful act, Bridas could have no cause of action against Unocal under the Shari'a even if Unocal's contract had the effect of interfering with Bridas's prior contract with the Afghanistan government.

The second witness presented by Unocal bearing upon Afghan law was Muhammed Rostayee. He is a lawyer licensed to practice law in Afghanistan. He earned his L.L.M. degree from the George Washington University School of Law. Rostayee is the attorney general of the National Islamic Movement of Afghanistan (NIMA). This position is also referred to as the premier prosecutor of Afghanistan. He is responsible for prosecuting criminals and "implementation of the law to Afghanistan and officers and generally in the public." He is also the head of the Afghanistan Human Rights Commission.

After detailing the procedures for trying a lawsuit in an Afghanistan court and the appellate process, Rostayee agreed with Professor Edge's conclusions concerning the content and predictability of Afghanistan law. Specifically, he testified that "[t]here is no mention of [the causes of action pled by Bridas] in the civil code and neither in the Shari'a law."

The final witness presented by Unocal bearing upon Afghan law was Abdul Salam Azimi. He is a former law professor and university president at Kabul University Law School in Afghanistan. After the invasion by the Soviet Union in 1978, Professor Azimi fled to Pakistan and eventually accepted a position in Kuwait, working for the government compiling the Islamic Law Encyclopedia. Professor Azimi testified that the courts are presently functioning in Afghanistan and that trials and appeals are being resolved by Afghan courts. As did Professor Edge and Rostayee, Professor Azimi testified that under the Afghan Civil Code and the Shari'a, commercial injuries in Afghanistan are compensable only when the injuries are direct. Thus, according to Professor Azimi, as pled, Bridas has no cause of action against Unocal under Afghan law for tortious interference or civil conspiracy.

Bridas presented one witness bearing upon Afghan law. Mark Hoyle, Ph.D., is an administrative law judge in London, England, and is a consultant on Islamic law. Dr. Hoyle testified that in researching the issues presented to him by Bridas, he experienced great difficulty in locating reliable sources dealing with Afghan law. He nevertheless testified that in his opinion, based upon the Hanafi, as it has been codified in the Afghan Civil Code and Commercial Code, a cause of action exists for interference with an existing and prospective contractual relationship. Dr. Hoyle relied on various articles of the civil code, relating to varying subject matter, to reach his conclusion. He also relied on interpretations of Islamic law followed in

the nations of the United Arab Emirates, Jordan, and Egypt.

Unocal and Delta responded to Dr. Hoyle's testimony by presenting testimony from Frank Vogel, Ph.D. Dr. Vogel is a professor of law at Harvard University Law School. He is also the director of the Islamic Legal Studies Program. He teaches nothing but courses relating to Islamic law, including contract law, banking law, and commercial law. Dr. Vogel provided detailed testimony concerning the substance and applicability of Afghan law, tracing the origins of Islamic law back thirteen centuries. In directly controverting the testimony provided by Dr. Hoyle concerning his interpretation of various Afghan civil code articles, Dr. Vogel opined that the tort causes of action alleged by Bridas do not exist under Afghan law. Dr. Vogel testified that the Afghan–to–English translation of the civil code utilized by Dr. Hoyle was "inexact." Dr. Vogel testified that his opinion would be the same, whether applying traditional Shari'a principles under the Hanafi school, found in the *Mejelle,* or the Afghan civil or commercial code. *See* note 6, *supra.* In his attempt to cast light upon the religious policies that support his findings, Dr. Vogel provided the following testimony:

> One thinks, when one encounters anything like this, these torts specifically, if you encounter something in the translation that corresponds with these torts, you come up with absolutely nothing, not in any secondary works, not in anything that you have read in original works.

> So first there is a presumption against such a tort, you must admit.

> Then you think, well, might that be, because it is not unlikely that this situation has never arisen before. And then you think, well, perhaps it contradicts basic principles, and there is the principle that springs to mind that does stand in the way of this recognition of these torts that's been often mentioned. It is represented by Article 89 of the *Mejelle*

and Article 1510. . . . So this must be some part of the explanation as to why [these] torts are not recognized explicitly and that is, as it reads, Article 89, "The judgment for an act is made to fall on the person who does it. And it does not fall on the person who gives the order, as long as he does not compel the doing of the act." This is one in the *Mejelle,* and it appears in several others here, such as Article 1510: The order of a person is lawful in respect to his own property only. Therefore, if someone says to another, "Throw this property into the sea," and the person who receives the order, throws it, knowing that the property belongs to someone else, the owner can enforce compensation for that property from the person who threw it. Nothing is necessary for the person who gave the order, so far as he has not used force. . . .

> The concept is a profound one actually. The law is linked with morality and the onus for acts is placed on the person who has sort of got the point for the decision, that is, the one who takes it upon himself to perform the wrongful act, who voluntarily goes ahead and does something immoral.

> So the person who has ordered it offers no excuse for the person who does it. The person who does it is going to be held liable. This law is religious law, and they feel that the person who makes the fateful step to do the wrongful thing had a point of decision, and he should have withheld the act.

> \* \* \*

> We may make a moral judgment somewhat differently. But they have felt to accentuate the moral responsibility of the individual, this ought to be the rule.

Thus, according to Dr. Vogel's testimony, absent physical force, the act by Unocal, if any, that caused the government of Afghanistan to breach its gas pipeline contract with Bridas, is not a compensable injury under Afghan law. The liability for

breaching the contract and causing the harm to Bridas, if any, would fall squarely upon the shoulders of the Afghanistan government, whom was directly responsible in the physical chain of causation for causing the breach of contract and resulting harm.

Though the expert witnesses in this case disagree on the interpretation and predictability of Afghanistan law, we conclude that the evidence presented by Unocal shows that Afghanistan law is readily and reliably ascertainable and that is does not recognize the tort causes of action alleged by Bridas. *See Ahumada,* 992 S.W.2d at 558–59. Accordingly, the trial court's finding that Unocal was entitled to judgment as a matter of law was the proper legal conclusion.

■■■■ Briefly, we return our attention to the issue of public policy, which permeates the respective provisions contained in section 6 of the RESTATEMENT (SECOND) CONFLICT OF LAWS and is heavily relied upon by Bridas in assailing the trial court's summary judgment. We observe that Texas courts will not enforce a foreign law that violates good morals, natural justice or is prejudicial to the general interests of our citizens. *See Gutierrez,* 583 S.W.2d at 321. As the Supreme Court recognized in *Gutierrez* in analyzing the public policy ramifications of applying the laws of Mexico and in rejecting the "dissimilarity doctrine," it is clear that the laws of Turkmenistan and Afghanistan, respectively, are different than ours in many respects. *Id.* However, these differences by no means render the laws of Turkmenistan and Afghanistan violative of Texas public policy. *Id.* The laws of these nations have been in place and followed for many years, if not many centuries. Their laws are well-established, predictable, and certain. Neither nation recognizes tort causes of action for interference with existing or prospective contractual relations nor civil conspiracy. Whether the policies behind the failure to recognize these torts is based upon their systems of government or religion, there is nothing in the substance of the laws of Turkmenistan or Afghanistan, relative to the actions alleged by Bridas, inimical to good morals, natural justice, or the general interests of the citizens of this state. *Id.* at 322. The final two issues presented for review by Bridas are respectively overruled.

Because of our disposition herein, we need not address Unocal's cross-points concerning whether the trial court's summary judgment was supported under Texas law and whether the trial court should have granted Delta International's and Delta Oil Company's special appearances.

The summary judgment of the trial court is affirmed.