**LONG DISTANCE INTERNATIONAL, INC. and Star Marketing Service, Inc., Petitioners,**

v.

**TELEFONOS DE MEXICO, S.A. DE C.V., SBC International, Inc., and SBC Communications, Inc., Respondents.**

No. 00–0229.

Supreme Court of Texas.

Argued Feb. 21, 2001.

Decided June 14, 2001.

Randall A. Pulman, Juan M. Castillo, Stumpf Craddock Massey & Pulman, San Antonio, Peter M. Kelly, Miller Criaco & Kelly, Houston, for Petitioners.

Jorge E. Canseco, George H. Spencer, Jr., Jeffrey I. Kavy, Clemens & Spencer, James S. Golden, Daniel W. Lanfear, Hubert W. Green, Richard D. Billeaud, The Kleberg Law Firm, San Antonio, for Respondents.

Justice BAKER delivered the opinion of the Court.

This case involves two issues: (1) whether the plaintiff's contracts with Mexican customers in this case violated Mexican law, and, if so, (2) whether that illegality is a defense to the plaintiff's claims. Because we hold that the plaintiff's contracts did not violate Mexican law, we do not

reach the second issue. Accordingly, we reverse the court of appeals' judgment and remand the cause to that court to determine whether any other asserted ground supports the trial court's summary-judgment order.

## I. BACKGROUND

In 1976, the Mexican government granted Teléfonos De México (Telmex) a thirty-year exclusive concession to build, operate, and exploit public telephone service in Mexico. In 1990, the government amended the concession to facilitate the eventual transition to a competitive telecommunications market beginning in 1997.

SBC Communication (SBC) owns ten percent of Telmex's stock. SBC International (SBI), a wholly-owned subsidiary of SBC, assists Telmex with organization and development. The Office of the Secretary of Communications and Transportation (SCT) is a Mexican government administrative agency that oversees the country's telecommunication services. MCI, Long Distance International (LDI), and Star Marketing Services (SMS) are United States telecommunications companies.

When calls originate from Mexico to the United States, the call's Mexico leg is carried on Telmex's wires up to the border. The call's United States leg is then picked up by a United States carrier's line (here, MCI). Because the call originates in Mexico, Telmex bills the Mexican customer and reimburses MCI for its carrying the call's United States leg. When a call to Mexico originates in the United States, this process is reversed, with MCI billing the American customer and reimbursing Telmex for the Mexico leg. The carriers contractually set these "settlement amounts."

In 1992, Telmex and several United States carriers, including MCI, entered into agreements to provide International 1–800 services ("I800"). Usually, I800 calls are free to the caller and billed to the receiver. The agreement between MCI and Telmex established the billing amount for each leg of the I800 calls and contained the monthly settlement amounts between the companies.

MCI then entered into I800 agreements with three different types of United States customers. The first category was "end users." End users give their I800 number acquired from MCI to Mexican callers who in turn call the end user on that number to purchase goods or services. Rather than Telmex billing the Mexican caller, MCI bills the end user for the entire cost and then reimburses Telmex for the Mexico leg.

The second category of MCI's United States customers included other phone companies such as LDI and SMS, the plaintiffs here.[1] SMS contracted with MCI to receive I800 numbers that SMS supplied to LDI. LDI then contracted with Mexican callers rather than American end users. Under these contracts, LDI provided a Mexican caller with an I800 number linked to a Texas switching station. When the I800 number answered, the Mexican caller received a dial tone allowing them to call another United States number. LDI would bill the Mexican caller and pay MCI (through SMS) for the I800 number's use. MCI would then reimburse Telmex for the Mexico leg. Consequently, Telmex only set the rate for the Mexico leg. However, had the Mexican customer called its United States destina-

---

1. Tomas Revesz is the sole stockholder for both LDI and SMS. We refer to them collectively as LDI/SMS.

**350**

tion directly, Telmex could have set the Mexican customer's rate for the entire call.

The third category of MCI's United States customers included phone companies engaging in "call-back" services. These companies also provided I800 numbers acquired from MCI to Mexican callers. The I800 numbers were linked to a "caller-ID" system. So, when a Mexican customer called the I800 number, the call would not be answered, but the caller's number was electronically recorded. Then the Mexican customer would receive a call back, which would provide the caller with a dial tone to call anywhere in the United States. As in the second category of MCI customers, these American companies would bill the Mexican caller directly. However, because the call originating in Mexico was not answered, neither the caller nor the company would pay Telmex for the unanswered call. Instead, Telmex was only reimbursed for the Mexican leg of the call back, just as with any other call originating in the United States.[2]

A dispute about the I800 services first arose in 1993. In October, Jose Maria Rivas Moncayo, a SCT manager, wrote MCI a letter stating that the "call-back" scheme was illegal under Mexican law and requesting that MCI suspend service it provided to any customers engaged in this practice. In April 1994, Telmex sent MCI a letter explaining that "resale" was illegal under Mexican law and requesting a list of customers providing resale. Telmex stated that it would then forward MCI a list explaining who would be disconnected and when. MCI responded a month later, requesting a copy of specific laws and regulations prohibiting resale. MCI's response also explained that it did not understand the definition of resale under Mexican law. Furthermore, MCI refused to supply the customer list, asserting that this disclosure is illegal under United States law. In July, after consulting with SBI, Telmex began disconnecting I800 numbers it determined were being used for resale, including some numbers LDI acquired through SMS's contract with MCI.

In 1996, LDI/SMS sued Telmex and SBI for tortious interference with contractual relations, tortious interference with prospective relations, conspiracy to commit tortious interference, breach of contract, antitrust, and Texas Deceptive Trade Practices Act violations. The trial court granted Telmex and SBI summary judgment on all claims. The court of appeals affirmed, holding that because LDI/SMS was violating Mexican law, it could not maintain any of its claims. 18 S.W.3d 706, 714–15. On identical facts, the Fifth Circuit recently reached the opposite result, concluding that LDI/SMS's conduct did not violate Mexican law. *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 716 (5th Cir.1999), *cert denied*, 531 U.S. 917, 121 S.Ct. 292, 148 L.Ed.2d 200 (2000).

We granted LDI/SMS's petition for review to decide whether LDI/SMS's contracts violated Mexican law, and, if so, whether that illegality would provide a defense to the plaintiff's claims. Because we determine that LDI/SMS did not violate Mexican law, we reverse the court of appeals' judgment and remand to the court of appeals for it to consider whether any other asserted ground supports the trial court's summary-judgment order.

## II. SUMMARY JUDGMENT— STANDARD OF REVIEW

A defendant moving for summary judgment on an affirmative defense

---

**2.** The parties all agree that MCI's contracts with end users are legal. The parties also agree that LDI/SMS did not engage in call-back services.

has the burden to conclusively establish that defense. *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex.1999). Determining foreign law presents a question of law for the court. Tex.R. Evid. 203. Because the parties do not dispute the relevant facts, this is a proper case for summary judgment. *Havlen v. McDougall,* 22 S.W.3d 343, 345 (Tex.2000).

## III. DID LDI/SMS'S CONTRACTS VIOLATE MEXICAN LAW?

### A. Foreign Law—Standard of Review

■ Texas courts may apply Mexican law. *Gutierrez v. Collins,* 583 S.W.2d 312, 321 (Tex.1979). The court, and not a jury, determines the laws of foreign countries. Tex.R. Evid. 203. A party who intends to raise an issue about foreign law shall give notice, and, at least thirty days before trial, shall furnish all parties copies of any written materials or sources the party intends to use to as proof of foreign law. Tex.R. Evid. 203. If the materials or sources were originally written in a language other than English, the party relying upon them shall furnish all parties both a copy of the foreign-language text and an English translation. Tex.R. Evid. 203.

■ Rule 203 has been aptly characterized as a hybrid rule by which the presentation of the foreign law to the court resembles the presentment of evidence but which ultimately is decided as a question of law. *Ahumada v. Dow Chem. Co.,* 992 S.W.2d 555, 558 (Tex.App.—Houston [14th Dist.] 1999, pet. denied); *Lawrenson v. Global Marine, Inc.,* 869 S.W.2d 519, 525 (Tex.App.—Texarkana 1993, writ denied). Summary judgment is not precluded when experts disagree on the law's meaning if, as here, the parties do not dispute that all the pertinent foreign law was properly submitted in evidence. *Bridas Corp. v. Unocal Corp.,* 16 S.W.3d 893, 896 (Tex.

App.—Houston [14th Dist.] 2000, pet. denied). When experts disagree on how the foreign law applies to the facts, the court is presented with a question of law. *Bridas Corp.,* 16 S.W.3d at 896; *Ahumada,* 992 S.W.2d at 558–59. We review the trial court's determination of foreign law de novo. *See* Tex.R. Evid. 203; *El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.,* 8 S.W.3d 309, 312 (Tex.1999) ("Because the issue ... [involves] a question of law, our review is *de novo.*").

### B. The Record

Both parties, complying with Rule 203, requested that the trial court take judicial notice of certain Mexican-law provisions. Both parties provided copies and translations of the concession empowering Telmex to "build, install, maintain, operate and exploit a public telephone network for a period of 30 years, beginning March 10, 1976[,] throughout all the national territory, except the area under license to Telefonos del Noroeste, S.A. de C.V." This concession was modified on December 10, 1990. The pertinent sections of this modified version provide:

1–11 *Definition of Terms*

"User"—an individual or corporation with temporary or permanent access to a public or private telecommunication service.

. . . .

5–7 *Telmex Network Resale Capacity*

Telmex is required to permit its users to resell excess capacity contracted with Telmex except as provided in the following paragraph.

During the first six years of this Franchise, Telmex will not be obligated to permit the reselling of excess circuit capacity, to provide basic long distance telephonic public service.

MODIFICACIÓN AL TÍTULO DE CONCESIÓN DE TELÉFONOS DE MÉXICO (December 10, 1990) [Amended Title of Concession]. Telmex relies primarily upon Chapter III of the Ley de Vias Generales de Comunicación (General Means of Communication Law), which provides in pertinent part:

Article 8. To construct, establish and exploit general routes of communications or any type of connected services, a concession or permit from the Federal Executive through the Secretariat of Communications shall be necessary and subject to the precepts of this law and its regulations.

. . . .

Article 12. Concessions for the construction, establishment, or exploitation of general means of communication shall only be granted to Mexican citizens or corporations constituted under the laws of the country. . . .

. . . .

Article 14. Those interested in obtaining a concession or permit to build or exploit general means of communication shall forward a request to the Secretariat of Communications. . . .

. . . .

Article 48. A general means of communication should not be exploited that is the subject of a concession, or permit, nor its related services, without prior authorization. . . .

LEY DE VIAS GENERALES DE COMUNICACIÓN, ch. III. Telmex also relies on correspondence among and within Telmex, MCI, SCB, and the SCT.[3] This includes:

● An October 1993 letter from Jose Moncayo, a general manager with the SCT, to MCI stating that callback services are "illegal in Mexico, and in violation of the exclusivity provisions agreed to between the Federal Government and the TELMEX Company."

● An April 1994 letter from Telmex to MCI requesting the names of all its customers engaged in resale and stating that "resale is prohibited in Mexico at this time. Further, since none of these resellers have permits or concessions to operate in Mexico they are in violation of applicable Telecommunications Rules. There are only four (4) authorized international carriers for U.S. traffic. They are AT & T, MCI, Sprint, and TRT/IDB and they must transmit via Telmex for these calls. All national calls are also to be sent via Telmex for completion and billing to the Mexican market."

● A September 1994 letter from Telmex to MCI stating that Telmex "will not knowingly install I800 for resale and will immediately terminate those services we find to be resale applications."

● A 1994 letter from Telmex to MCI amending the terms of the I800 contract between Telmex and MCI to reflect that subscribers to I800 services cannot offer call-back or bypass services to Mexican customers.

Both parties also cite the Reglamento de Telecommunicaciones (Telecommunications Rulings). LDI/SMS notes that chapter II, article 6a requires a concession only to install, establish, operate, *and* exploit telecommunications networks. Telmex references section III, article 75, which provides that the "exploitation of the telecommunications network given in conces-

---

**3.** Because the alleged tortious interference occurred in 1994, and because Telmex claims it was justified in disconnecting LDI/SMS's I800 numbers at that time, we focus on the evidence leading up to that time rather than any evidence about subsequent Mexican law or policy.

sion must be carried out directly by its holder."

Finally, both LDI/SMS and Telmex rely on expert testimony about the legality of LDI/SMS's contracts under Mexican law. Elvia Salas De De Stefano, an attorney and former assistant to the director general of the SCT's legal affairs, testified in her deposition that no Mexican law expressly prohibited LDI/SMS's activities and thus that these activities were not illegal under Mexican law. She also proffered an expert report opining that LDI/SMS's conduct was legal.

In response, Telmex's expert Francisco Xavier Manzanero Escutia proffered a report opining that, because Telmex held the exclusive franchise to provide Mexican phone service, LDI/SMS's conduct could not be legal under Mexican law. Telmex also presented several current and former SCB and Telmex employees' depositions opining that LDI/SMS's conduct amounted to illegal reselling of long-distance services.

## C. THE PARTIES' CONTENTIONS

Telmex argues, and the court of appeals agreed, that LDI/SMS was operating as a Mexican telecommunications "provider." Telmex asserts that Mexican law prohibits any entity from exploiting international long-distance services without a concession. Thus, because Telmex held the exclusive concession until 1996, Telmex maintains that LDI/SMS's conduct could not have been legal. Telmex also asserts that even if MCI and LDI/SMS are considered "resellers," they still needed a Mexican concession. It argues that a 1995 law requiring concessions to resell phone service only restated the existing law rather than creating a new law. *See* LEY FEDERAL DE COMMUNICACIÒNES, ch. III, § I, art. 11 (1995) [Federal Law of Communication]. Finally, Telmex urges us to defer to the

SCT's Fifth Circuit amicus brief and Rivas Moncayo's letter, written while he was general manager for the SCT, condemning call-back services. It asserts that the SCT is entitled to agency deference and that Moncayo's letter applies to call-back schemes and LDI/SMS's conduct equally.

In response, LDI/SMS contends, as the Fifth Circuit concluded, that Mexican law does not forbid the resale of telephone services. LDI/SMS asserts that, in fact, the only relevant Mexican law contemplates that resale is permitted, though not required. Further, LDI/SMS notes that the law requiring a concession to merely resell Mexican phone service was not effective until after Telmex forced LDI/SMS out of business by disconnecting its phone lines. Thus, LDI/SMS asserts, just because resale without a concession later became illegal, that does not make its conduct retroactively unlawful. Finally, LDI/SMS contends that the Moncayo letter is not entitled to deference because the letter only discussed call-back services, something LDI/SMS did not provide. Moreover, LDI/SMS argues, we should only defer to official Mexican judicial, administrative, or legislative determinations—not an employee's opinion in a letter that contains no reference to specific law.

## D. ANALYSIS

We must first determine whether LDI/SMS was a "reseller" or "provider" of Mexican telecommunications service. Then we must determine whether any Mexican law expressly prohibits the service it provided.

### 1. Characterization of LDI/SMS's Services: Reseller or Provider?

Telmex claims that LDI/SMS *provided* phone service rather than *resold* phone service because the end result allowed

Mexican callers to call the United States for less money than Telmex would have charged for a direct call. We disagree. The Fifth Circuit aptly explained why, regardless of the practical outcome of LDI/SMS's services, LDI/SMS cannot be considered the phone-service provider:

> [T]he crucial difference between resellers and providers ... is that a reseller cannot compete with a monopoly provider because the provider is the reseller's only supplier. The reseller can only undersell the provider if the provider sells its services to the reseller for less than they are worth. That is not the same kind of competition a provider faces against another provider. Competition between the provider and the reseller is at the mercy of the provider and the provider's knowledge or ignorance of the market.

*Access Telecom, Inc.,* 197 F.3d at 704. In essence, LDI/SMS acted as a middleman, delivering and billing Telmex's service to Mexican customers. The relevant Mexican law at the time required a government concession to construct, establish, and exploit telecommunications systems. We read this provision to mean that if LDI/SMS had built its own telecommunications equipment and infrastructure and provided telecommunication service with its own equipment rather than purchasing and reselling Telmex's, then it would have needed a concession.

Our conclusion that LDI/SMS's conduct is better characterized as resale is further bolstered by both Telmex's and the FCC's characterization of this and similar services. Telmex refers to LDI/SMS as a reseller several places in the record. For example, Telmex's summary-judgment motion relies on its 1994 letter to MCI requesting the names of all MCI's customers engaged in resale and stating that resale is illegal. Telmex also relied on another 1994 letter to MCI, in which Telmex indicates that it will "not knowingly install I800 for resale."

The FCC has also characterized callback services, which are in many ways conceptually similar to LDI/SMS's services, as resale. *See generally VIA USA,* 10 F.C.C.R. 9540, 9541, 1995 WL 359102 (1995). Thus, we conclude that LDI/SMS was a reseller of Telmex's services rather than a provider of telecommunications services.

## 2. Legality of Resale under Mexican Law

■ Because we have concluded that LDI/SMS was a reseller of Mexican phone service, we consider Telmex's argument that, even if LDI/SMS is characterized as a reseller rather than phone-service provider, its conduct still violated Mexican law. We analyze this issue while recognizing the United States' "policy in favor of resale of international switched service" and look to the FCC's pronouncements in the call-back services area for guidance. *VIA USA,* 10 F.C.C.R. at 9541.

Call-back services are similar to LDI/SMS's service—with one important difference. Call-back services require the caller to make an incomplete (and thus unbilled) call to a number that captures the caller's number on a caller-identification system. Call-back services are arguably more objectionable than LDI/SMS's services because they result in a call's using a provider's wires without any compensation to the provider. Nevertheless, the FCC has approved call-back services as beneficial to consumers both here and abroad so long as another country's laws do not *expressly* prohibit the service. *See generally VIA USA,* 10 F.C.C.R. at 9541, 9557.

In *VIA USA,* AT & T challenged the FCC's approving licenses for international call-back services, arguing that the ser-

vices were illegal under United States and international laws. Reiterating the United State's policy favoring international resale, the FCC explained:

> [It] advances the public interest, convenience and necessity by promoting competition in international markets and driving down international phone rates. We believe it is in the best interests of consumers—and eventually of economic growth—around the world.

10 F.C.C.R. at 9541.

Also stating that "we take adherence to international obligations seriously," the FCC entertained an international comity argument. *VIA USA,* 10 F.C.C.R. at 9550. It discussed information it compiled from twenty-one countries in which three countries identified specific laws prohibiting international call-back services. Other countries expressed no opinion and some, including Mexico, pointed to general telecommunications legislation or concession arrangements favoring one monopolistic provider as support for the practices' alleged illegality. *VIA USA,* 10 F.C.C.R. at 9554.

Ultimately, the FCC concluded that international comity principles compelled its cooperation with other countries to prevent United States telecommunications companies from reselling international phone services "in countries where it is *expressly prohibited.*" *VIA USA,* 10 F.C.C.R. at 9557 (emphasis added). Towards this end, it invited any foreign government that "has expressly found" the practice unlawful, to notify the FCC with "specific documentation of its legal restrictions." *VIA USA,* 10 F.C.C.R. at 9558. It further provided that "[a]ny foreign government also may convey to the Commission's staff documentation of its specific statutory or regulatory measure in order to put U.S. carriers on notice that international call-back ... is illegal in its territory." *VIA USA,* 10 F.C.C.R. at 9558. Fi-

nally, it explained that, "[t]o facilitate such notification, we will maintain and periodically publish a list of countries which have forwarded such information to the Commission." *VIA USA,* 10 F.C.C.R. at 9558. Significantly, Mexico is *not* one of the fifty-seven countries that have declared call-back services unlawful. It is also not one of the thirty-six countries that have provided the FCC with specific laws outlawing this practice. *See* Federal Communications Commission, *FCC Public File Country List, at* <http://www.fcc.gov/ib/td/pf/callback.html> (last modified Aug. 8, 2000).

A clause from Telmex's concession confirms that resale is not illegal under Mexican law. It provides that during the amended concession's first six years, Telmex *may,* but is *not required,* to allow its users to resell its excess capacity. *See* Amended Title of Concession, para. 5–7 (December 10, 1990). This clause undermines Telmex's argument that resale is illegal under Mexican law. Logic dictates that if the Mexican government has given Telmex the option of allowing MCI to resell Telmex's services, then reselling its services cannot be illegal. Accordingly, we conclude that LDI/SMS's reselling Mexican telecommunications service did not violate Mexican law.

Our holding is narrow and based only upon the record before us. We express no view about whether Telmex's contract with MCI permitted resale; indeed the contract is not in the record. We hold only that Telmex cannot argue the illegality of something the Mexican government has expressly empowered Telmex to do— namely, allow MCI to resell service. Whether Telmex actually did so through its contract with MCI is not before us.

## IV. MEXICAN LAW'S EFFECT ON LDI/SMS'S CLAIMS

LDI/SMS asserts claims for tortious interference, breach of contract, antitrust,

**356**

and Deceptive Trade Practices Act violations. The Fifth Circuit, in *Access Telecom, Inc.*, noted that this Court had never considered the effect of foreign illegality on a contract governed by Texas law. 197 F.3d at 707. Here, the court of appeals considered all LDI/SMS's claims together, concluding that "the actions undertaken by [LDI/SMS] were illegal" and, "[a]s a result, [LDI/SMS] cannot recover under any of their asserted claims." 18 S.W.3d at 714–15. This is a flawed syllogism. However, because we conclude that LDI/SMS's contracts did not violate Mexican law, we leave for another day the question of what effect foreign illegality would have on these claims.

## V. CONCLUSION

The court of appeals erred in holding that LDI/SMS's contracts with its Mexican customers violated Mexican law. Thus, we reverse the court of appeals' judgment and remand the cause to that court to determine if any other grounds Telmex asserted in its summary-judgment motion supports the trial court's summary-judgment order. *See McKelvy v. Barber*, 381 S.W.2d 59, 64 (Tex.1964).

Justice HANKINSON and Justice JEFFERSON did not participate in the decision.