Opinion issued March 25, 2004












In The
Court of Appeals
For The
First District of Texas




NO. 01-03-00517-CV




GRIND FACTORY, L.P., Appellant

V.

DOMINIQUE MOCEANU, TRUSTEE, AND THE MOCEANU 1996 TRUST,
Appellees




On Appeal from the 11th District Court
Harris County, Texas
Trial Court Cause No. 0231737




MEMORANDUM OPINION
           Appellant, Grind Factory, L.P., appeals the summary judgment granted in favor of
appellees, Dominique Moceanu, Trustee, and The Moceanu 1996 Trust and against appellant. 
In two issues, appellant contends that the trial court erred (1) in granting appellees’ motion
for summary judgment based on appellees’ interpretation of a contract and (2) in granting the
motion on appellees’ defense of anticipatory breach. We affirm. 
BACKGROUND
           Appellant and appellees entered into a purchase and sale agreement (the Agreement)
under which appellant agreed to purchase from appellees real property, including land and
a prefabricated building, which appellant intended to use as a sports facility. The purchase
price of the property was $1,800,000, and the agreement provided for immediate payment
of $25,000 in earnest money and an additional $125,000 on or before the last day of the
inspection period, which was 60 days following the effective date of the Agreement. At the
time the Agreement was executed, May 25, 2001, the property was the subject of a lease to
LifeStream International, Inc. (the LifeStream Lease), which provided that the landlord could
terminate the lease upon 180 days’ written notice that the landlord had identified a purchaser
for the property. Section 5(f) of the Agreement acknowledged that the LifeStream Lease was
an encumbrance on the property and provided that appellee would “not take actions to
terminate the LifeStream Lease until (i) the expiration of the Feasibility Period [60 days from
the effective date of the Agreement] and (ii) [appellant]’s delivery of the Additional Earnest
Money to Title Company.” Closing on the sale was to occur on or before 90 days from the
effective date of the agreement. 
           As a remedy for the purchaser’s default, the Agreement provided as follows:
In the event that Purchaser should fail to consummate this Agreement
for any reason . . . then Seller may terminate this Agreement by notifying
Purchaser thereof and receive the Earnest Money as liquidated damages. . . . 
In the event Seller is entitled to the Earnest Money as liquidated damages, the
Earnest Money shall be immediately paid to Seller by the Title Company upon
receipt of written notice from Seller that Purchaser has defaulted under this
Agreement . . . .

           On July 23, 2001, a first amendment to the Agreement was executed. This first
amendment was superseded by a second amendment executed on August 22, 2001. In the
second amendment, the purchase price and closing date were amended as follows: 
                      If closing occurs during period                            Purchase Price
                      May 25, 2001 - May 24, 2002                             $1,800,000
                      May 25, 2002 - Nov. 24, 2002                             $1,850,000
                      Nov. 25, 2002 - May 24, 2003                             $1,900,000
                      May 25, 2003 - Oct. 24, 2003                              $2,050,000
                      Oct. 25, 2003 - May 25, 2004                              $2,100,000

           The second amendment acknowledged the receipt of $150,000 in earnest money and
added the following section to the agreement:
16. The Lease. Contemporaneously with the execution of this Agreement,
Seller, as Lessor and Purchaser, as Lessee, shall enter into that certain Lease
Agreement (the “Lease”) in the form of Exhibit “D” attached hereto, whereby
Seller leases to Purchaser the property for the period commencing upon the
date which is thirty (30) days following the date of termination of the
LifeStream Lease and terminating on the Closing Date, subject to the terms
and conditions contained therein. In the event the Lease is terminated for any
reason provided in the Lease, Seller shall have the option to terminate this
Agreement by giving written notice to the Purchaser. Notwithstanding
anything to the contrary contained herein or in any other document, any default
by Purchaser under either the Lease or this Agreement shall be considered a
default by Purchaser under both the Lease and this Agreement. (Emphasis
added.)

           Section 5(f) was amended, in pertinent part, as follows: 
Purchaser acknowledges that Seller will not take any actions to terminate the
LifeStream Lease until the date that Purchaser has requested Seller in writing
to terminate the LifeStream Lease. In the event that Purchaser does not make
such written request to Seller by February 22, 2002, Seller shall have the
option to either (a) terminate the Agreement . . . or (b) send LifeStream the
written notification to terminate . . . . (Emphasis added.)

           The section on closing was amended to provide, “The Closing . . . shall take place .
. . on any business day selected by Purchaser and which is on or before May 25, 2004.” The
amendment further provided that “to the extent that the LifeStream Lease has not been
terminated as of the Closing Date, . . . Seller shall assign to Purchaser . . . all rights and
obligations under the LifeStream Lease . . . .” 
           The provision relating to remedies for the purchaser’s default was amended as
follows: 
In the event that Purchaser should either (i) fail to consummate this
Agreement for any reason, . . . or (ii) be in default under the Lease at any time
during this Agreement, . . . then Seller may terminate this Agreement by
notifying Purchaser thereof and receive the Earnest Money as liquidated
damages. . . . In the event Seller is entitled to the Earnest Money as liquidated
damages and to the extent Seller has not already received the Earnest Money,
the Earnest Money shall be immediately paid to Seller by the Title Company
upon receipt of written notice from Seller that Purchaser has defaulted under
this Agreement . . . . (Emphasis added.)

           The contemporaneously executed Grind Factory Lease was “for a term commencing
on the date which is thirty (30) days following the date of termination of the LifeStream
Lease . . . and ending on the Closing Date . . . .” The lease provided for advance rental as
follows: 
Advance Rental. On the date that Tenant makes its written request to
Landlord to terminate the LifeStream Lease pursuant to Section 5(f) of the
Purchase Agreement, Tenant shall pay Landlord the sum of Eighteen
Thousand Dollars ($18,000.00) representing the Base Rent and estimated
Percentage Rent for the first calendar month of the Term of this Lease. 
(Emphasis added.)

The lease also provided for the following security deposit:
 
Tenant shall deposit with Landlord, on the date that Tenant makes its
written request to Landlord to terminate the LifeStream Lease pursuant to
Section 5(f) of the Purchase Agreement, the sum of Eighteen Thousand
Dollars ($18,000.00) as security for Tenant’s faithful performance of Tenant’s
obligations hereunder. . . . (Emphasis added.)

           On February 8, 2002, appellant requested an extension of the February 22, 2002
deadline for requesting the termination of the LifeStream Lease to May 31, 2002 because of
difficulties in obtaining financing for the purchase. Appellees denied the request, and, on
February 18, appellant notified appellees in writing, “Pursuant to Section 5(f) of the Purchase
and Sale Agreement . . . Purchaser hereby advises that it will require that the LifeStream
Lease be terminated on March 8, 2004, and not before. The lease agreement by and between
the Grind Factory LP, as Tenant, and Moceanu 1996 Trust, as Landlord, shall therefore
commence thirty (30) days thereafter.” 
           On March 19, appellees wrote to appellant, stating that appellees had the right to
terminate the Agreement and retain the earnest money or to send written notice to LifeStream
to terminate the lease, thus triggering the commencement of the Grind Factory Lease because
appellant was in default of both the Agreement by making an erroneous request to terminate
the LifeStream Lease and the Grind Factory Lease by failing to pay the $18,000 advance
rental or the $18,000 security deposit. On March 29, appellees sent appellant written notice
of termination of the Agreement.
           On June 25, 2002, appellant sued appellee for breach of contract. Appellant filed a
motion for partial summary judgment that its written request to terminate the LifeStream
Lease was timely under the Agreement. Appellees filed a motion for summary judgment on
the grounds (1) that their interpretation of the Agreement justified termination of the
Agreement and (2) that appellees’ defense of anticipatory breach, based on appellant’s failure
to pay the advance rent and security deposit, excused appellees from further performance on
the contract. The trial court granted appellees’ motion and denied that of appellant. 
DISCUSSION
Standard of Review
           Summary judgment under rule 166a(c) is proper only when the movant establishes that
there is no genuine issue of material fact and that the movant is entitled to judgment as a
matter of law. Tex. R. Civ. P. 166a(c); Randall’s Food Mkts., Inc. v. Johnson, 891 S.W.2d
640, 644 (Tex. 1995); Lawson v. B Four Corp., 888 S.W.2d 31, 34 (Tex. App.—Houston [1st
Dist.] 1994, writ denied). In reviewing a summary judgment, we must indulge every
reasonable inference in favor of the nonmovant and resolve any doubts in its favor. Johnson,
891 S.W.2d at 644; Lawson, 888 S.W.2d at 33. We will take all evidence favorable to the
nonmovant as true. Id. As movant, the defendant is entitled to summary judgment if the
evidence disproves as a matter of law at least one element of each of the plaintiff’s causes
of action. Lear Siegler, Inc. v. Perez, 819 S.W.2d 470, 471 (Tex. 1991); Marchal v. Webb,
859 S.W.2d 408, 412 (Tex. App.—Houston [1st Dist.] 1993, writ denied). A defendant
moving for summary judgment on an affirmative defense must establish that defense as a
matter of law. Long Distance Int’l, Inc. v. Telefonos de Mexico, 49 S.W.3d 347, 350-51
(Tex. 2001). We will affirm the summary judgment if any of the theories advanced in the
motion for summary judgment and preserved on appeal is meritorious. See Cincinnati Life
Ins. Co. v. Cates, 927 S.W.2d 623, 626 (Tex. 1996). 
Interpretation of Section 5(f)
           In its first issue, appellant contends that the trial court erred in granting appellees’
motion for summary judgment. Appellant specifically argues that its notice on February 18,
2002 to appellees to take action to terminate the LifeStream Lease on March 8, 2004 was
timely under the Agreement. Appellant contends that section 5(f) of the Agreement required
only that the written request be made by February 22, 2002 and did not provide any deadline
for the date on which the request was to be effective. 
           Appellees respond that the February 22, 2002 date was the deadline for both the
written request by appellant and the action to be taken by appellees as a result of that request. 
Appellees point out that the LifeStream Lease was to expire by its own terms on May 31,
2003, more than nine months before the date set by appellant for the termination of the lease,
and that, therefore, appellant’s request was not a request to terminate the lease. 
           If the parties advance conflicting interpretations of the contract, both interpretations
must be reasonable for an ambiguity to exist. Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d
711, 728 (Tex. 2001). Whether a contract is ambiguous is a question of law for the court to
decide by looking at the contract as a whole in light of the circumstances present when the
contract was entered. Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). If the instrument
can be given a certain legal meaning, it is not ambiguous and the court will construe it as a
matter of law. Id. 
           The provision of the Agreement at issue in this case is section 5(f) of the second
amendment, specifically, “the date that Purchaser has requested Seller in writing to terminate
the LifeStream Lease.” Section 5(f) unambiguously requires the purchaser (appellant) to
give written notice to the seller (appellees) to terminate the LifeStream Lease. That section
also provides that the seller will not take any action to terminate the LifeStream Lease until
such notice is given. 
           “The date that Purchaser has requested Seller in writing to terminate” can be
interpreted as the date of the request or the date of the requested termination. We must
therefore look to the Agreement as a whole in light of the circumstances present when the
Agreement was executed to determine whether both interpretations are reasonable. 
           Under the terms of the original Agreement, executed May 25, 2001, appellant was to
pay a total of $150,000 in earnest money within 60 days and closing was to occur within 90
days of the date of the execution. The LifeStream Lease, which expired on its own terms on
May 31, 2003, but could be terminated by appellees on 180 days’ notice, was a permitted
encumbrance on the property. Appellee was to take action to terminate the LifeStream Lease
after appellant’s delivery of the earnest money to the title company. There were no options
regarding a date to request termination or the date of closing. To the extent that LifeStream
did not vacate the property before closing, appellant was to assume the lease. 
           In the second amendment to the Agreement, appellant was given the option to extend
the closing date for up to three years. However, with that option came other provisions. The
purchase price of the property escalated over the three years from $1,800,000 to $2,100,000;
appellant was given a deadline by which it was to request the termination of the LifeStream
Lease; and, under certain circumstances, appellant was required to lease the property from
appellee beginning 30 days after the termination of the LifeStream Lease and ending at the
closing on the property. 
           Under appellees’ interpretation of section 5(f), appellant was required to request in
writing that appellees take action to terminate the LifeStream Lease by February 22, 2002. 
The LifeStream Lease would be terminated effective 181 days later, and, 30 days after that
termination (September 19, 2002—221 days from the date of the termination notice to
LifeStream), the Grind Factory Lease would commence. Appellant would, under this
interpretation, be required to lease the property from appellees unless appellant closed on the
property on or before September 19, 2002,


 and the property would be subject to a lease
during the remaining time that appellees owned the property. We conclude that appellees’
interpretation of section 5(f) is reasonable.
           Under appellant’s interpretation of section 5(f), appellant was required to request in
writing by February 22, 2001 that appellees take action to terminate the LifeStream Lease
by some date to be selected by appellant. Appellant does not place any restrictions on the
selected date or direct us to any guidelines given in the Agreement to determine the date. In
its February 18, 2002 letter requesting that the LifeStream Lease be terminated, appellant
chose March 8, 2004 as the termination date, a date more than nine months after the
LifeStream Lease expired by its own terms. Moreover, the date of the section 5(f) request
was the date for appellees to take action to begin the 180-day notice of termination. 
Therefore, under appellant’s interpretation, the LifeStream Lease would have “terminated”
15 months after it expired by its own terms. Such a result is not reasonable. 
           We conclude that, because appellees’ interpretation of section 5(f) is reasonable and
appellant’s is not, appellees’ interpretation is correct and section 5(f) is not ambiguous. 
Accordingly, we overrule appellant’s first issue. 
CONCLUSION
           Because our determination of appellant’s first issue is dispositive, we need not
consider its second issue. 
           We affirm the judgment.
 
 
                                                                                        Sam Nuchia
                                                                                        Justice

Panel consists of Justices Nuchia, Jennings, and Keyes.